BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

SALOMON ZAVALA, SBN 243424
Email: szavala@zavalalawgroup.com
ZAVALA LAW GROUP, P.C.
1930 Wilshire Blvd., Suite 817
Los Angeles, California 90057
Tel: (213) 413-0144
Fax: (323) 210-7385

DO KIM, SBN 231038
Email: dkim@dokimlaw.com
LAW OFFICE OF DO KIM APLC
3435 Wilshire Blvd., Suite 2700
Los Angeles, California 90010
Tel: (213) 251-5440
Fax: (213) 232-4919

Attorneys for Plaintiff
VICENTE BENAVIDES FIGUEROA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VICENTE BENAVIDES FIGUEROA,<br><br>Plaintiff,<br><br>vs.<br><br>KERN COUNTY; CITY OF DELANO; ROBERT CARBONE; GREGG BRESSON; RAY LOPEZ; ALFONSO VALDEZ; ESTATE OF JEFFREY NACUA; SARAH GARCIA NACUA; DR. JAMES DIBDIN; AND DOES 1–10, INCLUSIVE,<br><br>Defendants. | **CASE NO. 1:19-cv-00558-DAD-JLT**<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES:**<br><br>**(1) 42 U.S.C. § 1983 – FALSE EVIDENCE VIOLATIONS**<br><br>**(2) 42 U.S.C. § 1983 – JOINT ACTION CONSPIRACY**<br><br>**(3) 42 U.S.C. § 1983 BRADY VIOLATIONS**<br><br>**(4) 42 U.S.C. § 1983 – JOINT ACTION CONSPIRACY IN THE** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RECKLESS INVESTIGATION IN VIOLATION OF MR. BENAVIDES' DUE PROCESS RIGHT TO A FAIR TRIAL**

**(5) 42 U.S.C. § 1983 - *MONELL* VIOLATIONS - INCLUDING POLICY/CUSTOM ARISING FROM DEFENDANT KERN COUNTY'S  POLICY AND CUSTOM OF FAILURE TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE, RECKLESS INVESTIGATION, AND  FAILURE TO TRAIN AND SUPERVISE REGARDING THE TRUTHFULNESS, INTEGRITY, PRESERVATION, RELIABILITY AND DISCLOSURE OF EVIDENCE, PARTICULARLY IN THE CONTEXT OF CHILD MOLESTATION INVESTIGATIONS (AGAINST KERN COUNTY)**

**(6) 42 U.S.C. § 1983 - MONELL VIOLATIONS - INCLUDING POLICY/CUSTOM ARISING FROM DEFENDANT CITY OF DELANO'S  POLICY AND CUSTOM OF FAILURE TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE, RECKLESS INVESTIGATION, AND  FAILURE TO TRAIN AND SUPERVISE REGARDING THE TRUTHFULNESS, INTEGRITY,**

THIRD AMENDED COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PRESERVATION, RELIABILITY AND DISCLOSURE OF EVIDENCE, PARTICULARLY IN THE CONTEXT OF CHILD MOLESTATION INVESTIGATIONS (AGAINST CITY OF DELANO)**

**(7) CLAIM UNDER CALIFORNIA CODE § 815.2 FOR RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY FOR NEGLIGENT HIRING, FAILURE TO TRAIN, SUPERVISION, PROMOTION, AND RETENTION**

**(8) GROSS NEGLIGENCE**

**(9) CLAIM UNDER CALIFORNIA CIVIL CODE § 52.1**

**DEMAND FOR JURY TRIAL**

---

THIRD AMENDED COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION

1.    Plaintiff Vicente Benavides Figueroa ("Mr. Benavides" or "Plaintiff") is an innocent man who spent nearly 25 years on death row for a heinous murder he did not commit. Mr. Benavides was arrested on November 18, 1991, for the murder of Consuelo Verdugo. He was incarcerated from that time forward. He was found guilty of murder committed with three special circumstances of felony-murder rape, sodomy, and lewd conduct, as well as rape, sodomy, and lewd conduct with the infliction of great bodily injury during those offenses. He was sentenced to death and spent nearly 25 years on death row.

2.    Prior to his arrest, Mr. Benavides had no criminal history – neither arrests nor convictions, and no hint whatsoever of any inappropriate sexual conduct with minors or adults.

3.    On March 12, 2018, the Supreme Court for the State of California ("Supreme Court"), after evaluating the false statements and testimony of coerced witnesses, and the false medical evidence introduced by medical examiners, granted Mr. Benavides' petition for *habeas corpus* and vacated his death penalty conviction in its entirety. The Supreme Court stated that "[t]he concession and repudiations lead overwhelmingly to the conclusion that false evidence was introduced at trial." Although the Supreme Court did not directly address innocence, it quoted uncontroverted evidence that the prosecution's theory of the cause of death was anatomically impossible. Given that the prosecution's core theory of guilt was based on an anatomically impossible contention (that Consuelo died from blunt force penetrating injury to the anus that caused injury to the abdominal organs), it follows that Mr. Benavides is innocent. The Kern County District Attorney's Office implicitly recognized Mr. Benavides was innocent when it conceded he was convicted on the basis of false evidence and then declined to re-prosecute him, which occurred on April 19, 2018, at which point all criminal

1

charges against Mr. Benavides were dismissed. Mr. Benavides was released from custody on that date.

4.    Throughout the investigation and prosecution of Mr. Benavides' case, there were concerted efforts by law enforcement detectives and investigators, Child Protective Services ("CPS") and the prosecution to falsify evidence and, by threats and intimidation,  to influence and coerce the mother and the sister of the deceased child, Ms. Estella Medina and Cristina Medina, into inculpating Mr. Benavides. Medina family members were enlisted as agents of law enforcement to extract false information from witnesses to use against Mr. Benavides.

5.    Medical evidence was falsified, and exculpatory medical evidence was withheld. Lay witnesses and medical personnel were tainted with the state's theories of rape and sodomy during interviews and the investigation. Law enforcement reports and notes, withheld from the defense, confirmed the existence of dirt and debris in the vomit found in the kitchen garbage can, lending credence to Mr. Benavides' belief that Consuelo had been outside the apartment when she was injured – possibly by an automobile, which directly undermined the prosecutor's theory of the case. In some circumstances, investigating officers withheld exculpatory evidence from the prosecutors and the defense. In other situations, the prosecutors had and withheld exculpatory evidence from the defense.

## II.    JURISDICTION AND VENUE

6.     This action is brought by Mr. Benavides pursuant to 42 U.S.C. §1983.

7.    This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331. This Court has jurisdiction over Plaintiff's supplemental or pendant claims under California law pursuant to 28 U.S.C. §1367.

THIRD AMENDED COMPLAINT FOR DAMAGES

8.    The acts, errors, and omissions complained of all took place within the Eastern District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

**III.    PARTIES**

9.    Plaintiff resided in the State of California at all times herein alleged.

10.    Plaintiff timely filed a tort claim with Kern County on September 11, 2018, which was rejected on October 31, 2018. This action was timely filed within six months of the denial of the tort claim.

11.    Defendant Kern County is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Kern County District Attorney's Office and the Kern County Coroner's and Medical Examiner's Office (hereinafter "Kern County Coroner's Office") are, and at all times herein alleged were, agencies of Kern County. At all relevant times, Kern County employed Defendants James Dibdin, Robert Carbone, Gregg Bresson, Ray Lopez and Does 1-5. At all relevant times, Defendants James Dibdin, Robert Carbone, Gregg Bresson, Ray Lopez and Does 1-5 acted as agents of Kern County. Kern County and its officers, employees, and agents are responsible for Plaintiff's damages under 42 U.S.C. §1983 and California law.

12.    Defendant City of Delano is, and at all times herein alleged was, a duly organized public entity, existing under the laws of the state of California. The Delano Police Department is an official subdivision of the City of Delano, and all officers employed by said Department are employees of the City of Delano. At all relevant times, the City of Delano was the employer of Defendants Jeffrey Nacua, Alfonso Valdez and Does 6-10. The City of Delano and its officers, employees, and agents are responsible for Plaintiff's damages under 42 U.S.C. 1983 and California law.

13.   At times relevant herein, Defendant Robert Carbone ("Carbone") was a Deputy District Attorney of the Kern County District Attorney's Office. During the times he was investigating Mr. Benavides' case, he acted outside the scope of his prosecutorial duties and acted in an investigatory capacity. He is sued in his individual capacity.

14.   At all times relevant herein, Defendants Gregg Bresson ("Bresson") and Ray Lopez ("Lopez"), were Investigators for the Kern County District Attorney's Office. Defendants Bresson and Lopez acted within the course and scope of their respective duties and with the complete authority and ratification of Kern County. At all relevant times herein, Defendants Bresson and Lopez were acting under color of State law; under the color of the statutes, ordinances, regulations, policies, procedures, customs, and usages of Kern County. They are sued in their individual capacities.

15.   At all times relevant herein, Defendant Alfonso Valdez ("Valdez") was an employee of the City of Delano, working for the Delano Police Department. At all times relevant herein, Defendant Valdez acted within the course and scope of his duties and with the complete authority and, on information and belief, ratification of the City of Delano. At all relevant times herein, Officer Valdez was acting under color of State law, and under the color of the statutes, ordinances, regulations, policies, procedures, customs, and usages of the City of Delano. He is sued in his individual capacity.

16.   Jeffrey Nacua ("Nacua") is deceased. At times relevant herein, Jeffrey Nacua was an employee of the City of Delano, working for the Delano Police Department, and was a resident of the State of California. At all times relevant herein, Jeffrey Nacua acted within the course and scope of his duties and with the complete authority and, on information and belief, ratification of the City of Delano. Defendant "Estate of Jeffrey Nacua, Deceased" is entitled to defense and

indemnification by the City of Delano. On information and belief, Mr. Nacua's estate was administered without probate. On information and belief, Sarah Garcia Nacua is the widow of Jeffrey Nacua and distributee/recipient of the property of his non-probate estate. On information and belief, Sarah Garcia Nacua is a resident of the state of California. California Probate Code § 550 et seq. permits claims directly against an indemnified estate without the need to join the decedent's personal representative or successor in interest as a party. To the extent that a personal representative or successor in interest is a necessary party, and in order to ensure that any pre-conditions to indemnification by the City of Delano for the Estate of Jeffrey Nacua are satisfied, Sarah Garcia Nacua is named as a Defendant. At all relevant times herein, Officer Nacua was acting under color of State law, and under the color of the statutes, ordinances, regulations, policies, procedures, customs, and usages of the City of Delano.

17.   At all times relevant here, James Dibdin ("Dibdin") was employed by the Kern County Coroner's Office. Defendant Dibdin acted within the course and scope of his respective duties and with the complete authority and, on information and belief, ratification of Kern County. At all relevant times herein, Defendant Dibdin was acting under color of State law; under the color of the statutes, ordinances, regulations, policies, procedures, customs, and usages of Kern County. He is sued in his individual capacity.

18.   Plaintiff is unaware of the true identities, capacities, and roles of Defendant Does 1 through 10, inclusive, whether a corporation, agent, government entity, individual, or otherwise, and for this reason sues those Defendants by fictitious names. Plaintiff is informed and believes and thereon alleges, that each of the fictitiously named Defendants is in some manner and to some extent liable for the injuries alleged in the Complaint. Plaintiff will seek leave to amend the

THIRD AMENDED COMPLAINT FOR DAMAGES

Complaint to alleges the true identities, capacities, and roles of those fictitiously named Defendants when they are determined.

19.   Defendants Kern County, City of Delano, Robert Carbone, Gregg Bresson, Ray Lopez, Alfonso Valdez, Estate of Jeffrey Nacua, Sarah Garcia Nacua, Dr. James Dibdin, and Does 1-10, inclusive, are hereinafter referred collectively as "Defendants." The reference to the Estate of Jeffrey Nacua encompasses the conduct of Mr. Nacua while employed by and acting on behalf of the City of Delano.

## IV.    GENERAL ALLEGATIONS

20.   Plaintiff is informed and believes, and herein alleges, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in taking the actions hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

21.   Each paragraph of this Complaint is expressly incorporated into each cause of action that is a part of this Complaint regardless of where that paragraph appears in the Complaint.

22.   The acts and omissions of the Defendants were malicious, callous, oppressive, wanton, reckless, grossly negligent, negligent, and/or deliberately indifferent with respect to the rights of Mr. Benavides.

## V.    COMMON FACTS TO ALL CAUSES OF ACTION

### A.    Consuelo Verdugo's Death

23.   On the evening of November 17, 1991, Estela Medina ("Ms. Medina") and Mr. Benavides brought Ms. Medina's daughter, 21-month old Consuelo Verdugo ("Consuelo"), to the Delano Regional Medical Center's ("DRMC") emergency room.  Ms. Medina, who worked as a nurse's aide at DRMC, had left Consuelo and her 9-year old sister Cristina in the care of her boyfriend, Mr. Benavides, who often stayed with her and her daughters.

6

24.   Cristina and Consuelo were watching television and coloring when Ms. Medina left for work. Cristina asked if she could visit her friend, Maribel, who lived in the same apartment complex. Mr. Benavides gave Cristina permission to visit Maribel. Approximately fifteen minutes later, Mr. Benavides called for Cristina to return home. When Cristina returned to the apartment, Mr. Benavides was holding Consuelo. Mr. Benavides told Cristina to call her mother at the hospital because something was wrong with Consuelo.

25.   Ms. Medina had left her apartment at approximately 6:40 p.m. to report to work at DRMC by 7:00 p.m. At 7:20 p.m., Ms. Medina received the call from Cristina, who told her Consuelo was pale, sick, and could not breathe. Ms. Medina returned home approximately five minutes later to find Mr. Benavides sitting on the edge of her bed with Consuelo in his arms. Ms. Medina immediately drove Consuelo to DRMC, accompanied by Mr. Benavides and Cristina. When the family arrived at the hospital, Ms. Medina parked the car in front of the emergency room and took Consuelo inside.

26.   Dr. Ann Tait, the emergency room physician at DRMC, and the emergency room nurses, were the first to observe and treat Consuelo on the night of November 17, 1991. Dr. Tait began treating Consuelo for a head injury, but soon realized that Consuelo required a higher level of care than DRMC was equipped to provide, and arrangements were made to transfer her to Kern County Medical Center ("KMC") in Bakersfield. At that time, Consuelo's abdomen began distending, indicating internal bleeding and a worsening of her condition. Consuelo was then transferred to KMC for surgery and a higher level of care. On November 19, 1991, due to her life threatening condition, Consuelo was transferred to UCLA Medical Center, where she underwent further surgery. She died on November 25, 1991 as a result of her internal injuries.

THIRD AMENDED COMPLAINT FOR DAMAGES

27.   Because the medical evidence is central to understanding the falsified evidence in the case, particularly Defendant coroner Dibdin's false testimony, we explain it in detail in the next sub-section.

**B.     Mr. Benavides' Conviction Was Based on False Medical Evidence.**

28.   Several experts who testified at Mr. Benavides' trial recanted their trial testimony and indicated that they had never been provided the medical records from DRMC. Had they had those medical records, which demonstrate that their conclusions of molestation were erroneous, they never would have provided the erroneous statements and evidence used to prosecute Mr. Benavides. Every prosecution medical expert (except for Defendant Dibdin) recanted his or her testimony that Consuelo was sexually abused, which led the Supreme Court to vacate Mr. Benavides' conviction without the need for an evidentiary hearing. The facts recited in the following paragraphs of this subsection summarizing the false evidence are taken from the Supreme Court's habeas decision, *In re Figueroa*, 4 Cal.5th 576 (2018) and the medical records:

*1.  Medical Evidence Presented At Mr. Benavides' Trial.*

29.   Consuelo Verdugo's mother, Estella Medina, Mr. Benavides, and Cristina brought Consuelo to a hospital emergency room at Delano Regional Medical Center (DRMC) on the evening of November 17, 1991. The DRMC records indicate that Cristina reported that Consuelo had run into the front door of the house, fell down and lost consciousness.  Consuelo was limp and minimally responsive to external stimulation. She moved her arms and legs and withdrew from pain, but did not appear to recognize her mother. She had a small bruise on her forehead, with scrapes on her nose and lip. Medical personnel focused on Consuelo's head injury and did not do a complete examination of her genitalia. There is no indication in the DRMC medical records of any trauma to the genitalia or anus.  Catheter insertion would prove difficult and was repeatedly unsuccessful.

THIRD AMENDED COMPLAINT FOR DAMAGES

30.    As Consuelo's condition worsened, she became comatose and was transferred to the Kern Medical Center (KMC). The receiving charge nurse noted Consuelo had "blown pupils," often seen incident to blunt force trauma from an auto accident. Consuelo's distended abdomen was the immediate focus of attention at KMC. Attempting to insert a catheter, the charge nurse noted a nearly quarter-sized bruise on Consuelo's external genitalia and a tear extending from her urethra to vaginal opening. A KMC emergency room physician, also trying to insert a catheter, superficially examined Consuelo's genital and anal areas.

31.    Within twenty minutes of her arrival, Consuelo's abdomen had become greatly distended. Diagnostic surgery revealed her bowel, duodenum, and pancreas were "cracked in half," with portions of each resting on either side of her spine. The surgeon testified these injuries could have been caused by a kick or punch to the abdomen. He also noted scars and other indicia of prior injury between Consuelo's colon and liver. These injuries were one to two months old. He did not know whether Consuelo had been sexually assaulted.

32.    The morning after surgery, Consuelo was evaluated by pediatrician Jess Diamond. A thorough examination revealed a tear in Consuelo's hymen, a bruise on her perineum, swelling around her anus, and a lack of rectal tone. Dr. Diamond testified these injuries could result from "acute rape." Based upon the subsequent autopsy report of Dr. James Dibdin, Dr. Diamond testified that Consuelo had suffered a tear to her vaginal wall. That injury could explain the difficulties with catheter insertion. Dr. Diamond acknowledged that Consuelo had suffered a blunt force injury to her abdomen, but explained that sodomy could have caused the injuries to her abdominal organs if the "penetrating force ... rupture[d] the ... rectum, then push[ed] the internal organs aside" until reaching the pancreas and duodenum, splitting them apart. Even if an external blow caused Consuelo's

abdominal injuries, however, Dr. Diamond still believed that she had been sodomized.

33. On November 19, 1991, Consuelo was transferred to UCLA Medical Center ("UCLA"). Upon arrival, her entire body was swollen. She was oozing blood, and kidney function had ceased. Doctors performed a second surgery. The surgeon (Dr. Anthony Shaw) closely examined Consuelo's anus and saw no tearing. He explained that his inability to detect tearing could have been due to the extensive swelling. The surgeon testified that nothing in Consuelo's medical records was inconsistent with sexual abuse. Consuelo died on November 25, 1991.

34. The forensic pathologist, Dr. Dibdin, falsely identified Consuelo's cause of death in his autopsy report as "blunt force penetrating injury of the anus," and later testified that the anus had expanded to seven or eight times its normal size. He testified that Consuelo suffered anal lacerations along with injuries to her internal organs, including her bowel and pancreas. Dr. Dibdin noted abrasions to the vagina and anus, as well as healing injuries to the genital and anal region, suffered approximately four weeks earlier. He testified that there was a tear in the back wall of the vagina that a catheter, with its soft tip, could not have caused. Consuelo had five fractured ribs, which Dr. Dibdin believed were caused by tight squeezing during a sexual assault. Dr. Dibdin attributed the brain infarcts and brain swelling to Consuelo having been violently shaken. Dr. Dibdin testified the anal injuries were consistent with penile penetration causing acute lacerations and direct abdominal injury. He also noted evidence of healing rib fractures that were three to four weeks old.

   2. *Medical Evidence Presented In Mr. Benavides' Habeas Petition, Including Several Doctors Who Had Testified For the Prosecution, Established That The Previous Medical Evidence Was False.*

35. In his habeas petition, Mr. Benavides established that false evidence, now repudiated or undermined, resulted in his convictions for rape, sodomy, lewd

THIRD AMENDED COMPLAINT FOR DAMAGES

conduct, and murder and the special circumstance findings. Specifically, he showed – including from testimony from doctors who had previously testified for the prosecution – that Dr. Dibdin's theory that Consuelo's injuries were caused by anal penetration was both false and medically impossible. He also showed evidence characterized as sex abuse injuries to Consuelo's genitalia and anus was false and misleading.

36.    Contrary to the trial evidence, Consuelo in fact showed no signs of sexual assault when examined at DRMC, the first hospital where she received care. Her injuries were the result of medical intervention, including repeated failed efforts to insert a catheter, use of an adult-sized Foley catheter rather than a pediatric catheter, rectal temperature taking, use of paralytic medication, and physical examination. Nurse Anita Caraan Wafford, who helped treat Consuelo when she was brought to DRMC, provided a declaration explaining that no one at DRMC noted any anal or vaginal trauma.

37.    Dr. William A. Kennedy II, an expert in pediatric urology, opined in support of the habeas petition that, "to a high degree of medical certainty" Consuelo had not suffered anal or vaginal penetration. Had vaginal or anal tearing been sustained in the hours before treatment, "Consuelo likely would have been bleeding noticeably by the time she arrived at the hospital." He added that "[t]his is especially true if ... penetration by a penis or [other] object were so severe as to have violated her ... abdominal cavity as proposed by Dr. Dibdin." Dr. Kennedy further opined that DRMC medical staff had had ample time to observe Consuelo's genital area while taking her temperature rectally and trying to insert a catheter. After exhaustively reviewing Consuelo's medical records, Dr. Kennedy noted that DRMC medical staff saw no bleeding or other genital trauma, "indicat[ing] that she did not sustain injury to her genitalia or anus prior to her arrival."

THIRD AMENDED COMPLAINT FOR DAMAGES

38.   Two doctors who treated Consuelo at UCLA, the final hospital to which she was admitted, reviewed all of the medical records. They declared that anal penetration could not have been the cause of death because the organs between the anus and upper abdomen were not injured. As explained by Dr. Rick Harrison, the physician in charge of Consuelo's care at UCLA, the cause of death given by Dr. Dibdin was anatomically impossible. Dr. Harrison explained, "Given the location of [Consuelo's] injuries they could not have physically been caused by a grown man's penis because had she been injured in such a manner the surgeons would have seen injuries to her rectum and colon and other physicians and nurses treating her would have likely seen tears to and bleeding from her rectum."

39.   In addition to injuries caused by numerous medical interventions, trauma to the anal and genital region subsequently noted at KMC and UCLA was, in part, due to systemic edema: body-wide swelling caused by Disseminated Intravascular Coagulation ("DIC"). DIC causes an inability to clot, leading to widespread bleeding out of the blood vessels and edema (swelling). Consuelo's medical records indicate that she was in the initial stages of DIC when she was admitted to KMC and was fully in DIC after the exploratory surgery at KMC. Dr. Harrison explained in his habeas declaration that, "[b]ecause her body was so swollen, [he] was not able to fully examine her genitalia or rectum to confirm the sex abuse findings of the medical staff at KMC." Had Consuelo sustained injuries to those areas from penile penetration, however, he "would have expected that [they] would have been visible despite the swelling." He saw no such injuries.

40.   Dr. Diamond, the KMC child abuse expert who examined Consuelo the morning after her surgery, noted a tear to her hymen and perineum bruising. However, Dr. Kennedy explained that, in patients with DIC, bruising and tearing from even minor touching or movement are common because the skin becomes very fragile. The genital region is comprised of more delicate skin than other areas

THIRD AMENDED COMPLAINT FOR DAMAGES

of the body. It "deteriorates more quickly and noticeably than the surrounding tissue." The bruises and tears noted on Consuelo's anus and genitalia were likely caused by repeated attempts at catheterization. Dr. Kennedy noted that the "likelihood of unintentional injury from digital manipulation [of the genitalia] is heightened in nonresponsive children." The anal tearing could have been caused by rectal temperature-taking, Dr. Diamond's examination, or even a bowel movement.

41.  Notably, the genital and rectal injuries were not seen during Consuelo's treatment at DRMC. Medical evidence in support of the petition from a DRMC nurse explained that "[t]here are no indications of trauma to [Consuelo's] genitalia and anus on her chart because no one who treated [her] that night at DRMC saw any, even though we had the time and opportunity to do so."

42.  Consuelo's genital and anal region was photographed at UCLA. The photos show extensive swelling due to DIC, but no tears to her genitalia or anus. Dr. Kennedy explained that, had she suffered a sexual assault four days before, the photographs would have shown the tearing that she was alleged to have suffered. Indeed, any severe tears would have worsened as a result of her critical condition because edema would have stretched the skin, making lacerations appear more pronounced. Dr. Kennedy further explained that the photos showed no tears of even a minor nature.

43.  Dr. Kennedy also explained that Consuelo's lack of rectal tone, initially attributed to a penetrating injury, was instead the likely result of paralytic medication she had been given. Dr. Kennedy explained, "Anal sphincter laxity is a well-known side effect of" paralytic medications. No anal sphincter laxity or other anal injury was seen at DRMC, as would be expected if she had suffered penile penetration.

THIRD AMENDED COMPLAINT FOR DAMAGES

44.   This combined evidence establishes that the tearing and anal laxity noted during Dr. Dibdin's autopsy had resulted from normal medical procedures, contrary to Dr. Dibdin's testimony.

45.   Many of the medical professionals who testified at petitioner's trial subsequently recanted their testimony, such that the Supreme Court characterized a comparison between witnesses' trial testimony and their later declarations as "striking."

46.   Dr. Harrison, from UCLA, originally testified that the injuries he saw may have been caused by penile anal penetration. He later declared that he had not been given Consuelo's DRMC medical records or the autopsy report before testifying. "Had [he] seen [all of Consuelo's] records and been asked to opine on the cause of death offered by the pathologist, [he] would have testified that it was anatomically impossible."

47.   Similarly, Dr. Leonardo Alonso, a medical resident who treated Consuelo at KMC, unequivocally testified at trial that he believed Consuelo had been sexually assaulted. He subsequently declared that he had not reviewed Consuelo's initial medical records either before treating her or before testifying. After reviewing the records, he no longer believed that Consuelo suffered a sexual assault on the day of her admission.

48.   Dr. Diamond, the child abuse expert who evaluated Consuelo at KMC, testified at trial that the appearance of Consuelo's anal region was consistent with penetration by an object larger than a finger. He subsequently declared that "it is now my opinion to a high degree of medical certainty that Consuelo was not raped or sodomized."

49.   Dr. Nat Baumer, a medical expert, testified at the trial for the defense and admitted that reputable physicians concluded that Consuelo had been sexually

14

assaulted. Dr. Baumer later unequivocally declared that the child "was not anally or vaginally penetrated."

50.   Dr. Anthony Shaw, a UCLA surgeon, testified at the trial that it would be improper to conclude based on his postoperative notes that Consuelo had not suffered a sexual assault. He subsequently declared that he had not been given Consuelo's complete medical record before testifying and "[c]onsequently, [his] testimony supported the prosecution's allegations that Consuelo had been anally penetrated with a penis which, based on [his] own observations, [he] could not support."

51.   Others who provided related testimony at trial later declared that they did not see evidence of sexual trauma or did not believe the purported cause of death by anal penetration was medically possible.

52.   Dr. Jack Bloch, a KMC surgeon, testified at trial that he did not know whether Consuelo's internal injuries could have been caused by anal penetration. In his habeas declaration he stated that, had he been given Consuelo's DRMC medical records before testifying, he would have stated "to a high degree of medical certainty, that Consuelo was not anally or vaginally penetrated ... in the hours prior to admission at DRMC."

53.   The District Attorney's Office provided no explanation during the habeas of why the full medical records had not been provided to these witnesses in connection with their formation of their medical opinions provided to the prosecution.

54.   Nurse Anita Caraan Wafford, Consuelo's nurse at DRMC, declared, "[W]e never had any concern that Consuelo had been the victim of any type of sexual assault." Frances Zapien, an ER technician at DRMC, initially testified that she did not believe Consuelo suffered sexual abuse and subsequently declared that

15

THIRD AMENDED COMPLAINT FOR DAMAGES

she did not notice any indication of sexual assault when assisting with a failed catheterization.

55.   Dr. F. Warren Lovell, a forensic pathologist who testified for the defense at trial declared that, had he reviewed Consuelo's complete medical history before trial, he "would have testified that there was no indication in her medical records which would lead [him] to suspect that Consuelo had been vaginally or anally penetrated with a penis ... on the night of November 17, 1991."

56.    Dr. Ann Tait, the ER doctor at DRMC, declared that neither she nor the nurses saw any sign of trauma to indicate sexual abuse, although they had ample opportunity to do so.

57.   Dr. Diamond twice recanted his trial testimony. First, in 2009, he disavowed his trial conclusion of vaginal penetration. He had testified that he saw a small tear to Consuelo's hymen. Dr. Diamond testified that, based on the hymenal tear and the internal vaginal tear reported by Dr. Dibdin, he concluded that Consuelo had been vaginally penetrated. His conclusion was bolstered by his inability to obtain a urine sample following catheterization. In fact, Consuelo had been catheterized during her recent surgery and was becoming incapable of producing urine due to kidney failure. Dr. Diamond testified that he believed the catheters he inserted passed directly into the abdominal cavity through the tear in Consuelo's vaginal wall noted in the autopsy report.

58.   After reviewing the medical records, autopsy report, and declarations supporting the petition, however, Dr. Diamond no longer believed that Dr. Dibdin's finding of vaginal wall tearing could be substantiated. Accordingly, Dr. Diamond recanted his testimony that Consuelo had been raped.

59.   In 2012, Dr. Diamond submitted a second declaration more fully recanting his testimony. After consulting with Dr. Astrid Heppenstall Heger, M.D., F.A.A.P., whom he characterized as "the pre-eminent expert in the field of child

THIRD AMENDED COMPLAINT FOR DAMAGES

1  sexual abuse and sexual assault," Dr. Diamond disavowed his opinion that

2  Consuelo had suffered anal penetration. Dr. Diamond now believes, "to a high

3  degree of medical certainty," that Consuelo's abdominal injuries did not result

4  from anal penetration by a penis or similar object.

5      60.  Dr. Heger also provided a declaration in support of the habeas petition.

6  After reviewing medical records, testimony, and declarations, she concluded death

7  due to blunt force penetrating injury of the anus "is so unlikely" that it reaches "the

8  point of being absurd." Dr. Heger explained that the cause of death attributed in

9  this case has never "been reported in any literature of child abuse or child assault."

10  Had it occurred here, "it would be a unique and singular noteworthy incident in the

11  annals of pediatric child abuse literature."

12      61.  Deputy Attorney General Kelly LeBel interviewed forensic pathology

13  expert Dr. Tracey Corey in connection with the habeas petition, and the transcript

14  and audio recording of the interview was provided to the court. That interview cast

15  further doubt on Dr. Dibdin's autopsy report. Dr. Corey stated that she was

16  "embarrassed about the pathologist because what he says isn't even ...

17  anatomically possible." She elaborated, "I'm embarrassed that ... a pathologist

18  didn't know better, didn't know anatomy better."

19      62.  Dr. Corey also explained that elements of Dr. Dibdin's testimony were

20  demonstrably incorrect. For example, Dr. Dibdin testified that he had examined

21  autopsy slides of Consuelo's anal tissue. Dr. Corey explained Dr. Dibdin's

22  testimony was necessarily inaccurate. The alleged anal tissue was patently from the

23  large intestine.

24      63.  In the habeas petition, Mr. Benavides also established that false

25  evidence was presented at the trial regarding Consuelo's rib fractures, loss of

26  oxygen to the brain, and health history. Mr. Benavides also provided habeas

27  evidence that Dr. Dibdin's assertions that the microscopic slides of the anus and

28

THIRD AMENDED COMPLAINT FOR DAMAGES

genitalia showed chronic trauma was false.  The Supreme Court did not find it necessary to assess that issue for the habeas.

**C.    The Initial Investigation By The District Attorney's Office And The Delano Police Department ("DPD") and District Attorney Investigators.**

64.    Without any incriminating information against Mr. Benavides from DRMC, law enforcement immediately accused Mr. Benavides of raping and sodomizing Consuelo while he was alone with her during a fifteen-minute period on the evening of November 17, 1991.

65.    By November 18, 1991, a day after Consuelo was brought to the hospital, Delano police officers investigating Consuelo's injuries had already formulated the theory that Mr. Benavides had raped and sodomized her. A DPD detective interviewed Mr. Benavides, arrested him and then interviewed him again on that date.  Mr. Benavides was informed of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, prior to the second interview, which took place after he was arrested. He told the detective he started preparing dinner for himself, Cristina and Consuelo when Ms. Medina left for work; that Cristina asked for his permission to play with her friend and said she would only be gone for about 15 minutes; Consuelo apparently followed Cristina outside, and Cristina brought her back inside.

66.    Mr. Benavides told the detective that he did not know what had happened to Consuelo because he had not seen how she got hurt.  He said that, when Cristina started to go out again, he told her she was to take Consuelo along, but Cristina did not want to and tried to hurry out the door. He said he thought Consuelo may have attempted to follow Cristina and she shut the door hard and quickly. Mr. Benavides told the detective that either just before or just after the door was shut, he returned to the kitchen. About a minute later, he noticed he was

18

hearing no sound from Consuelo. He could not see the front door from the kitchen, so he went into the living room where he found the front door partially ajar.

67.   Mr. Benavides opened the front door and saw Consuelo right outside the door on a grassy area adjacent to the carport. She was lying on her back looking up, her head slightly tilted to one side, with blood on her nose and mouth. She was vomiting. He picked her up and took her to Ms. Medina's bedroom, put her on the bed, and then cleaned up her face using some toilet tissues. At that point, he said, "[Consuelo] looked bad, that her eyes were contorting and rolling and he could tell she was injured bad." Mr. Benavides told the detective he went outside and walked to the end of the apartment building where he met up with Cristina, who was then returning home. Mr. Benavides remembered cleaning up the vomit. He confirmed that Consuelo had only been out of his sight for one minute.

68.   On November 26, 1991, the day after Consuelo died, Detective Al Valdez ("Officer Valdez") of the DPD and Kern County District Attorney's Investigator Gregg Bresson ("Investigator Bresson") interviewed Ms. Medina. They sought her corroboration of their theory that Plaintiff had sexually abused Consuelo prior to her death and directly caused her death through a violent sexual assault. Ms. Medina told police that she did not know what had happened to her daughter, Consuelo, but that she did not believe Mr. Benavides had harmed her. Ms. Medina rebuffed Valdez's and Bresson's suggestion that she testify in court that Mr. Benavides had in any way hurt her child, because she was confident that he never had.

69.   From the outset, Officer Valdez and Investigator Bresson were assisted in the investigation by officials and employees from the Kern County District Attorney's Office, the DPD, and the Kern County Medical Examiner's Office while acting in their investigatory capacities.

THIRD AMENDED COMPLAINT FOR DAMAGES

70.   Evidence (including notes and reports) was systematically falsified throughout the investigation, and that false evidence was then presented at trial. Exculpatory evidence was systematically withheld from the defense throughout the case.

### D.   The Collusion Between Law Enforcement And Child Protective Services.

71.   While Ms. Medina was suffering from the tragic death of her young daughter Consuelo, Valdez and Bresson engaged in a malicious, unlawful campaign to coerce and pressure Ms. Medina into providing incriminating evidence against Mr. Benavides for improper sexual activity with her daughters. In response to, and as punishment for, Ms. Medina's rebuff of Valdez's and Bresson's attempt to have her state that Mr. Benavides had harmed her daughter, they unilaterally decided to  remove Cristina from her custody without consulting Child Protective Services ("CPS"). By this conduct, later ratified by other Defendants, they were attempting to pressure and coerce Ms. Medina into giving false evidence against Mr. Benavides. Valdez and Bresson made this decision alone, failing to consult any social worker, child protective services worker, Department of Health Services caseworker, or psychologist. They told Ms. Medina that the decision was "just one we [Valdez and Bresson] are making, it's a tough one and until our investigation is concluded, we will have Cristina in a protective custody situation." District Attorney Investigator Ray Lopez ("Investigator Lopez") later affirmed law enforcement's sole responsibility for removing Cristina.

72.   At the conclusion of Ms. Medina's interview, just days before Thanksgiving of 1991, Detective Valdez and Investigator Bresson, accompanied by Cristina's aunt, Diana Alejandro, took Cristina to Jamison House, a facility for children in the county's care. That was the last time Cristina was allowed to see anyone in her family, including her mother, until

20

January 1992. Ms. Medina was prohibited from seeing her child for Thanksgiving or Christmas that year. (Ms. Medina only regained custody in January 1992, but, as is explained below, DA Investigator Lopez later orchestrated a second removal of Cristina as a means of coercing Ms. Medina into providing false evidence.) At the preliminary hearing, on December 12, 1991, District Attorney Robert Carbone falsely represented to the court that his office had not orchestrated Cristina's removal. He misrepresented this fact by stating that Cristina's removal "has absolutely nothing to do with my office." On information and belief, Mr. Carbone acted as the supervisor in this case over the investigative activities of District Attorney investigators Lopez and Bresson acting in an investigative capacity, and in doing so was also acting in his investigative capacity.

73.   Ms. Medina's sister, Diana Alejandro, has two children (who are therefore Ms. Medina's nieces), Vicky Salinas ("Vicky") and Darlene Salinas.  In the course of an interview between DA Investigator Lopez and Vicky in February 1992, Lopez convinced Vicky that Mr. Benavides was guilty of sexually molesting Consuelo, and in order to advance his prosecution, asked Vicky to help him change Cristina's mind about Mr. Benavides and incriminate him, which Vicky did. The evidence that Vicky Salinas and others were pressured and enlisted to, and did, gather information and influence and coerce witness statements and evidence to support the prosecution's case was never disclosed to the defense.

E.    **District Attorney Investigators Coerced Ms. Medina To Recant Her Favorable Previous Statements About Mr. Benavides.**

74.   From the moment of his arrest, Mr. Benavides maintained his innocence and cooperated with Kern County officers and the DPD. No physical or forensic evidence linking Mr. Benavides to the crime was discovered on his person. DRMC medical personnel unanimously and consistently advised Kern County DA investigator Ray Lopez that they had seen no evidence of trauma to

21
THIRD AMENDED COMPLAINT FOR DAMAGES

Consuelo when she was brought in. Through the utter lack of physical or forensic evidence linking him to the crime, and the absence of injury when admitted to DRMC, it was, or quickly should have been, apparent that Mr. Benavides did not commit murder.

75.    Meanwhile, Ms. Medina's sister, Diana Alejandro, and her daughters Vicky and Darlene, surveilled and investigated Ms. Medina at the direction of District Attorney Investigator Ray Lopez, and continually provided Investigator Lopez with information about Ms. Medina's life, actions, and whereabouts.

76.    On July 9, 1992, District Attorney Investigator Lopez re-interviewed Ms. Medina regarding the case as part of his ongoing investigation to develop facts to support the prosecution's theory of the case. Investigator Lopez again asked Ms. Medina if Mr. Benavides had ever mistreated her daughters, showed signs of molesting or abusing them, or did anything to them that bothered or upset her. She again affirmed that Mr. Benavides never mistreated her girls, that there was no indication whatsoever that they were molested, and that he never did anything to the girls that bothered or upset her. Despite Ms. Medina's repeated statements, Investigator Lopez repeatedly attempted to pressure and influence her to change her answer.

77.    Unsatisfied with Ms. Medina's steadfast protestations of Mr. Benavides' innocence, Lopez decided to remove Cristina immediately and for the second time from Ms. Medina's care. The custom and practice of Department of Human Services/CPS caseworkers was to rely on and defer to the judgment of District Attorney investigators where there were criminal investigations or proceedings, which is what occurred here. At DA Investigator Lopez's instigation, Department of Human Services/CPS caseworkers again initiated proceedings to remove Cristina from Ms. Medina's custody and place her in Vicky Salinas' custody. In doing so, they relied on Lopez's recommendation, which was in turn

THIRD AMENDED COMPLAINT FOR DAMAGES

provided to the court, and without whose efforts such removal would not have occurred. By removing Cristina from Ms. Medina's custody, Mr. Lopez's objective was to induce and pressure Ms. Medina to provide facts favorable to the prosecution. This essentially amounted to blackmail, placing Ms. Medina in the untenable position of possibly never having her only remaining child in her custody again.

78.    Ultimately, the recommendations of the DA investigators for reunification between mother and daughter was effectively conditioned on Ms. Medina adopting the investigators' desired answers to their questions. Their willingness to recommend reunification was tied to her agreement that Mr. Benavides was guilty and to provide statements in support of that contention. And their support for reunification was essential, given that it was their recommendation and opinion that was the driving factor in whether reunification would happen.

79.    In fact, throughout the pendency of Mr. Benavides' case, District Attorney Investigator Lopez interceded in Cristina's custody case so as to prevent the court from awarding Ms. Medina custody, and to preserve the coercive conditions of control of Ms. Medina inherent in Cristina's placement.

80.    Ms. Medina learned through the repeated removal of her daughter from her home that her statements regarding Mr. Benavides' guilt or innocence, regardless of when or to whom they were made, directly affected the juvenile court's determination of whether she obtained custody or visitation with Cristina. DA Investigator Lopez and CPS officials removed Cristina on this second occasion although Ms. Medina had been dutifully caring for Cristina for the past several months, and there was no evidence of abuse or neglect during that period. The removal, and subsequent proceedings, were based exclusively on Ms. Medina's rebuff of the repeated efforts by the District Attorney and Delano PD Investigators

and Officers to induce her to falsely incriminate Mr. Benavides. In both removal instances, the initiation and furtherance of proceedings to deprive her of custody of, and visitation with, Cristina were based on false accusation that she was lying and protecting Mr. Benavides. In her highly fragile emotional and psychological state, with one daughter dead and the other forcibly removed from her custody, Ms. Medina finally realized that the only way she could obtain custody of Cristina was to falsely attest to Mr. Benavides' guilt and demonstrate that she had tried to protect her daughters from him.

81.   By threatening to take Cristina away permanently and by telling Ms. Medina they would prevent her from having custody of or contact with her child unless she accused Mr. Benavides, the Defendants, particularly the District Attorney investigators acting in an investigatory capacity, knowingly and substantially coerced and interfered with her testimony, intentionally encouraged her to provide materially false testimony, knowingly (or with reckless disregard for, or deliberate indifference to, the truth and Mr. Benavides' rights) elicited false testimony, and used abusive investigatory techniques they knew would, or were likely to, elicit false evidence.

82.   As a result of the successful efforts to coerce Ms. Medina into making false statements about Mr. Benavides, to which she later testified, the jury was led to falsely believe that Mr. Benavides had in the past committed some act -- likely one of physical or sexual abuse -- that caused Ms. Medina not to trust him with her daughters. If Ms. Medina had not been coerced into providing false evidence, and had she testified truthfully and in accordance with her initial interview statements, which she would have done absent the pretrial coercion to induce her to provide new and false evidence, the jury would have believed that Mr. Benavides, consistent with his lawful and appropriate behavior

THIRD AMENDED COMPLAINT FOR DAMAGES

with Ms. Medina's children, did not molest or abuse Consuelo on November 17, 1991 and would not have found him guilty or sentenced him to death.

**F.    Defendant Detectives and Investigators Coerced Ms. Medina To Recant Her Favorable Previous Statements By Conditioning Her Custody of Cristina on Inculpating Mr. Benavides.**

83.    Delano Police detectives and Kern County District Attorney investigators coerced and manufactured false testimony of Cristina by removing her from her home, isolating her from her mother and family, repeatedly questioning her about sex abuse after she stated that neither she nor her sister had been abused, and suggesting information to her during interviews. In their effort to obtain false, incriminating evidence against Mr. Benavides, they filed false reports with Department of Human Services/Child Protection Services caseworkers to induce them to support and continue that removal.

84.    Detectives Al Valdez and Jeff Nacua of the DPD first interviewed Cristina on November 18, 1991. During that formal interview, Detectives Nacua and Valdez used coercive and formulaic tactics designed to interrogate a suspect and ensure a confession. But, as Cristina was only nine years old and not a suspect, these tactics were highly improper, and they knew or should have known that they would, or likely would, result in eliciting false facts and unreliable statements. The detectives used such devious and inappropriate methods as accusing Cristina of lying and pressuring her to make specific statements by using suggestive and leading questions. Dr. James Wood, a leading expert and consultant to law enforcement agencies on developing appropriate techniques for eliciting reliable information from children, opined that this "is one of the worst interviews of a child I have ever encountered." At the time that this occurred, the potential of coercing child witnesses into making false statements through the use of improper, leading, abusive or pressure driven interview techniques when investigating potential sexual abuse was well known and highly publicized.

85.   Cristina informed the officers that she believed Mr. Benavides was telling the truth. In response, the officers told her that, "as police officers," they thought she was wrong and suggested that she did not even believe herself. They repeatedly asked the same question: whether she believed Mr. Benavides. Finally, Cristina said she did not know whether she believed him, and then ultimately said "No? No." These coercive and suggestive tactics pressured Cristina, a young girl, to alter her honestly held beliefs and statements about Mr. Benavides, in an attempt to end the officers' repeated questioning and badgering.

86.   At the end of this interview, the officers told Cristina to "think about [what really happened]," to think about her answers and think about the truth, because they would be coming back to question her again to find out what happened "for sure." They conveyed to Cristina that she had given incorrect answers in failing to implicate Mr. Benavides, and that they would give her a second chance to get the "correct" answers in the next interview. Detectives Nacua and Valdez knew or should have known that they were using investigative techniques that were so coercive and abusive that those techniques would yield, or were likely to yield, false information. Further, Detectives Nacua and Valdez engaged in their improper investigative techniques despite the fact that they knew or should have known that Mr. Benavides was innocent.

87.   In addition, DA Investigator Lopez asked Vicky (Ms. Medina's niece) to help him change Cristina's mind about Mr. Benavides and have her provide incriminating information against him. On June 12, 1992, Lopez interviewed Cristina at Vicky's house, and tape-recorded this interview. At the recorded interview, after Cristina had been removed from her home and away from her mother, she said that she did not believe Mr. Benavides. Cristina's change in her opinion was the result of the officers' coercive, abusive and suggestive

interview techniques. Cristina's statements at trial materially affected the verdict and prejudiced Mr. Benavides. These false statements were then used by the prosecution to support its theory that Consuelo died from injuries that were part of an ongoing pattern of abuse that began when Mr. Benavides began babysitting for Ms. Medina's daughters.

88.   The prosecutor relied upon Cristina's statement in his closing argument when he urged the jury to find that "not only does it show us that the child was previously abused, both physically and sexually, but it shows that it happened over a period of time." If the Defendant detectives and investigators had not engaged in the foregoing improper and illegal conduct, Cristina's false and unreliable testimony would not have been introduced at trial, which evidence was highly material to leading the jury to believe that Mr. Benavides was the cause of Consuelo's ongoing injuries or caused her injuries on November 17, 1991.

89.   Defendant District Attorney investigators Lopez or Bresson, or both of them, prejudicially interfered with the defense's access to prosecution witnesses by threatening Ms. Medina with losing custody of her daughter and telling Cristina not to speak to the defense.  The instructions that Cristina not talk to the defense came directly from them. This violated Mr. Benavides' right of due process to interview witnesses against him. On information and belief and as an alternative to the allegations regarding Mr. Carbone in ¶ 72 *supra*, Mr. Carbone originally was not advised of the role played by DA investigators in the first custody proceedings removing Cristina from Ms. Medina. On further information and belief, he was advised in his capacity as a supervisor over the Defendant DA investigators in the second removal. Both he and the Defendant DA investigators were acting in an investigatory capacity in relation to both removal efforts.

90.   Kern County officials withheld from the defense Cristina's DHS/CPS and juvenile court records that demonstrated the coordinated and concerted efforts

THIRD AMENDED COMPLAINT FOR DAMAGES

1
2
3

of DHS/CPS workers and law enforcement involved in Mr. Benavides' case to keep Cristina from her mother, Ms. Medina, in order to coerce the testimony of these two witnesses.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

91.    Ms. Medina ultimately succumbed to the coercion of separating her from Cristina unless she provided the false narrative that Mr. Benavides had abused her children and provided the investigators the narrative to the contrary they were seeking. As a result, when Deputy District Attorney Carbone asked her at trial about Cristina's statement that Plaintiff had taken Consuelo into their bedroom while he was babysitting, Ms. Medina testified that she "always told [Mr. Benavides] if anything - if you would injure my kids in any way, I would have you locked up." Similarly, when the prosecutor asked if she told Cristina to lock the door when she went to bed and Ms. Medina was not home, but Mr. Benavides was there, she testified that she told her daughter to close the door when he was there. These statements portrayed to the jury a false sense of Ms. Medina's mistrust of Mr. Benavides' care of her children that was contrary to Ms. Medina's true feelings towards Mr. Benavides, and her original statement to DA investigators. This false information was derived from the pressure and coercion Defendants placed on Ms. Medina to provide evidence supporting Defendants' theory of Mr. Benavides' guilt, which was material to persuading the jury that Ms. Medina believed that Mr. Benavides was guilty. The pressure and coercion on Ms. Medina described above was not disclosed to the defense). In contrast to her original, repeated statements to the investigators, Ms. Medina said nothing about her belief that Mr. Benavides was innocent.

24
25
26
27

92.    Material documents unlawfully withheld from Mr. Benavides included, but are not limited to the following: (1) documents stating that juvenile dependency court worker Alice Thompson obtained police reports "to determine if sister should be released or held"; (2) the juvenile court minute orders which listed

28

District Attorney Investigator Ray Lopez as a witness in the juvenile case; (3) documentation of phone contacts between Lopez and Cristina's caseworker David Chenault; (4) documentation of interviews of Cristina, and of Cristina's family members, conducted by DHS/CPS workers; (5) documentation that Cristina was receiving counseling at Henrietta Weill Memorial Center and Tulare Youth Services that showed she was having trouble remembering important aspects of the event surrounding her sister's death; and (6) a report that indicated Cristina had received a sex abuse exam from Dr. Jess Diamond before the preliminary hearing in Mr. Benavides' case that demonstrated she had not been sexually abused.

93.   The foregoing withheld documents contained material information necessary for the defense to impeach Cristina's and Ms. Medina's false statements and to demonstrate the State misconduct in coercing their false testimony. In addition, Mr. Benavides and his counsel were never provided CPS records that demonstrated that Cristina Medina's memory regarding the events of the case was poor, which would have been in direct contrast to evidence which vouched for Cristina's credibility at trial.

94.   The combined foregoing activity by Defendants Valdez, Nacua Bresson and Lopez, in concert with CPD employees, ultimately resulted in Ms. Medina and Cristina providing false evidence against Mr. Benavides. On information and belief, numerous communications regarding this effort exist, none of which were disclosed to the defense.

95.   There was a coordinated effort among employees of the District Attorney's Office, the police department, and CPS to remove Cristina from Ms. Medina's custody until and unless she agreed to testify against Mr. Benavides.

THIRD AMENDED COMPLAINT FOR DAMAGES

1
2

### G.    Pattern And Practice Of Kern County And The District Attorney's Offices' Collusion With CPS To Violate The Constitutional Rights Of Criminal Defendants.

3    96.    Kern County has a long history of using the combined investigative
4    activity of law enforcement and DHS/CPS to violate the constitutional rights of
5    criminal defendants, manufacture false evidence, and coerce testimony, spanning
6    the time period before and after the investigation and prosecution of Mr.
7    Benavides. Beginning in 1982, and continuing into the 1990s, Kern County
8    District Attorney employees (acting in an investigative capacity) and DHS/CPS
9    workers investigated dozens of molestation cases. They engaged in investigative
10    techniques they knew would result in false evidence, and relied on incredible,
11    disprovable, unreliable, coerced, manipulated and/or false allegations of sexual
12    abuse, rape, sodomy, and ritual abuse they obtained through these improper means.
13    They then used this evidence gathered in the course of their investigations to
14    institute and pursue criminal charges against various individuals. As part of their
15    investigations, Kern County District Attorney and DHS/CPS employees acted in
16    concert and used this false and unreliable evidence to institute and pursue child
17    protective services proceedings as a means of pressuring parents to provide
18    testimony to support their false criminal molestation claims.

19    97.    The Kern County District Attorney's Office obtained over three dozen
20    convictions in these molestation cases in the 1980's and early 1990's by: (1) using
21    coercive interviewing techniques such as removing children from their homes and
22    communicating to the children that they could not return home until they
23    incriminated individuals in their molestation; (2) manufacturing statements of
24    abuse by suggesting to children that they were abused and masking this in
25    reports and using false evidence obtained through these improper techniques to
26    remove children from their parents' custody; (3) withholding evidence of sex
27    abuse exams in which no evidence of abuse was found or using false medical

28

THIRD AMENDED COMPLAINT FOR DAMAGES

evidence; (4) withholding audiotapes and transcripts of interviews in which children stated they had not been sexually abused; and (5) refusing to allow sex abuse exams of alleged victims when they knew these exams would produce exculpatory evidence. Below are two examples:

   a.   In *Larry McCuan, et al. v. County of Kern*, et al. (Super. Ct. Kern County, 1989, No. 194695), McCuan's 2 daughters, coached by their step-grandmother who had custody of them, alleged they had been abused by their parents and accused them of being part of a sex ring. The McCuans were convicted in 1984. The convictions of the McCuans were overturned in 1996, in part because of the County's withholding evidence of alleged sex abuse exams in which no evidence of abuse was found and also by using false medical evidence.

   b.   Six similar cases occurred throughout Kern County. For instance, the testimony of five young boys was the prosecution's key evidence in a trial in which four defendants were convicted, with John Stoll, a 41-year old carpenter, receiving a sentence of 40 years for lewd and lascivious conduct. In 2004, the accusers came back to court and testified that Stoll never molested them. The court overturned the verdict in part because the prosecution had suggested to the children that they were abused and masking this in their reports and using false evidence. *People v. Stoll* (1989) 49 Cal.3d 1136.

98.   The Kern County District Attorney's Office obtained over three dozen convictions in these molestation cases by withholding evidence of sex abuse exams in which no evidence of abuse was found or using false medical evidence (*Jeffrey B. Modahl v. County of Kern* (Super. Ct. Kern County, 1999, No. 99-6463); *People v. Kniffen, et al.* (West Kern Muni. Ct. Kern County, 1982, Nos. 33610, 33614,

THIRD AMENDED COMPLAINT FOR DAMAGES

33624); *Larry McCuan, et al. v. County of Kern, et al*. (Super. Ct. Kern County, 1989, No. 194695); *People v. Pitts* (1990) 223 Cal. App. 3d 606 (1990)).

99.  In other cases, coercive interviewing techniques such as removing children from their homes and communicating to the children that they could not return home until they incriminated individuals in their molestation were utilized (*Modahl*, *supra*; *Kniffen*, *supra*; *McCuan*, *supra*; *Pitts*, *supra*; *People v. Stoll* (1989) 49 Cal.3d 1136; *Hazel Wong, et al.v. County of Kern* (Super. Ct. Kern County, 1986, No. 195381); *Betty Palko et al. v. County of Kern*, et al. (Super. Ct. Kern County, 1986, No. 194286).

100. The aforementioned cases also show the overturning of convictions due to the manufacturing of statements of abuse by suggesting to children that they were abused and masking this in reports (*Modahl*, *supra*; *Kniffen*, *supra*; *McCuan*, *supra*; *Pitts*, *supra*; *Stoll*, *supra*, 49 Cal.3d 1136; *Wong*, *supra*). In this line of cases, their overturning was also based on the prosecution's withholding audiotapes and transcripts of interviews in which children stated that they had not been abused (*Modahl*, *supra*; *Kniffen*, *supra*; *McCuan*, *supra*,).

101. The prosecution of alleged child molesters in Kern County was so replete with gross misconduct that the Attorney General's office stepped in to investigate child abuse prosecutions in the county. (*See* John Van de Kamp, California Attorney General, "Report on the Kern County Child Abuse Investigation," September 1986, and supplementary reports and data.) A Grand Jury Investigation was also conducted. The report condemned a "presumption of guilt" applied by officers in the district attorney's office, DHS/CPS agencies, and Kern County police and sheriffs agencies in their pursuit of molestation suspects. It found that, instead of relying upon legally acceptable evidence, investigators were removing children from homes, denying family visitations,

and arresting parents based on nothing more than "gut feelings," even where medical evidence demonstrated that alleged victims had not been abused.

102. One of the issues identified by the Attorney General's Report was the placement of children in child protective custody, for which investigating agents had total discretion. The investigating agents did not need a supervisor's approval. They routinely removed child witnesses from their parents without a proper basis for doing so, which occurred to Cristina in Mr. Benavides' case.

103. Despite the Attorney General's and Grand Jury's reports exposing these corrupt and unconstitutional practices, they continued in various forms, as is evidenced by the coercive and abusive investigative techniques, and false evidence, in Mr. Benavides' case.

104. Thirty-four of Kern County's child sexual abuse conviction obtained during the 1980's were overturned on appeal or granted habeas petitions, such as in Mr. Benavides' case. Despite several such appellate determinations prior to Mr. Benavides' prosecution, Kern County engaged in similar conduct in his case and took no remedial steps to cure its pattern of due process violations.

105. The foregoing conduct condemned by the Report on the Kern County Child Abuse Investigation was not conduct undertaken in the name of or on behalf of the State of California. The Kern County District Attorney's Office routinely elicited false evidence in child molestation cases through the use of investigative techniques they knew or should have known would yield false evidence. It had: (1) no policies or supervisorial requirements in place to ensure that false evidence was not being used in such cases; (2) no systems in place to track child molestation cases, even after the Report on the Kern County Child Abuse Investigation condemning the handling of such cases, to ensure that such investigative techniques were not used; (3) it had no systems in place to ensure of and to track that abusive techniques or other exculpatory

THIRD AMENDED COMPLAINT FOR DAMAGES

evidence was provided to the defense, and (4) no systems in place to ensure that abuses and improper conduct was reviewed and, where appropriate, disciplined. It failed to train its officers and personnel in proper and lawful investigative techniques. It failed to discipline its officers and personnel when they engaged in unlawful conduct, thereby ratifying the unlawful practices that permeated the District Attorney's Office.

106. Similarly, in this case, Delano PD officers and District Attorney investigators knowingly elicited and/or coerced false statements from two key witnesses, Consuelo's mother (Ms. Medina) and her sister (Cristina), depriving Mr. Benavides of a fundamentally fair and reliable determination of guilt and penalty. The activities of these investigators, which occurred during investigative activities by personnel of the District Attorney's Office, were withheld and never disclosed to the defense. These activities were critical evidence and were material to Mr. Benavides' resulting conviction.

107. The coercive and manipulative tactics described above (and elsewhere in this Complaint) represent customary techniques used for years in suspected molestation cases in Kern County, techniques that have been repeatedly exposed and discredited. These errors had a substantial and injurious effect and influence on the jury's determination of the verdicts at both the guilt and penalty phase.

### H. Medical Evidence Was Falsified In Order To Incriminate Mr. Benavides.

*1. Delano Detectives And District Attorney Investigators Suppressed And Falsified The Evidence That Consuelo Did Not Have Vaginal Or Anal Injuries When She Was Admitted to DRMC.*

108. As presented in greater detail, in Section V(B), the emergency room staff at DRMC was the first medical personnel to treat 21-month old Consuelo on November 17, 1991. All of the DRMC staff who observed Consuelo in the first

two hours following the incident, affirmatively and emphatically stated to law enforcement, that they had not seen any injuries to Consuelo's genitalia or anus. Had Consuelo been raped and sodomized, injuries to her genitalia and anus would have been grossly obvious and would have been observed and noted at the time. Any trauma later observed was the result of medical treatment and her deteriorating medical condition.

109. Had Consuelo suffered injuries as the result of sexual assault prior to her arrival at the hospital, the staff at DRMC would have observed bleeding, lacerations, bruises, or other evidence of injury in Consuelo's genitalia. They did not observe any evidence of such injury despite having ample time and opportunity to do so. Their observations of Consuelo's genitalia and anus were sequentially before any other medical exam and were made before Consuelo underwent repeated unsuccessful attempts at catheterization, was given paralytic agents causing a lax anal tone, and developed DIC, which together explain the later observed trauma). The DRMC observations (or lack thereof) are, therefore, the most reliable available evidence of the state of Consuelo's genitalia and anus prior to medical intervention.

110. The DRMC emergency room medical personnel were adamant in interviews with Delano detectives that they saw no evidence of injury to the anus when they examined Consuelo on November 17, 1991. Had Consuelo been injured by penetration of the rectum with sufficient force to cause injury to her internal organs, both lacerations of the anus and bleeding would have been apparent and noted by DRMC personnel.

111. Radiologist Dr. Chabra at DRMC dictated his initial report on November 18, 1991, after reviewing a radiograph of Consuelo's chest taken on November 17, 1991. He saw no evidence of rib fractures.

112. On December 2, 1991, Dr. Chabra placed an Amended Report in the medical chart, in which he identified healing fractures of the 8th through 10th ribs on the right. He estimated that these fractures were 2 to 3 weeks old. And two days later, he added a further Addendum Report which added mention of a recent fracture of the left 8th rib with displacement of the fragments. Dr. Chabra added this Addendum Report at the prompting of Delano Police Detectives Valdez and Nacua, who, although not medically trained, purported to conduct their own review of the radiographs and identified additional rib fractures not noted in Dr. Chabra's original and amended reports. These Defendants deliberately fabricated these alleged facts, and knowingly or recklessly induced Dr. Chabra to amend his report with information they knew or should have known to be false. (It is noteworthy that, as part of his false reports, Dr. Dibdin claimed to observe acute rib fractures, and a recent displaced fracture of the 8th rib on the right, either on the front or back.) On information and belief, Detectives Valdez and Nacua intended that this amended report from Dr. Chabra could be used to support Dr. Dibdin's false evidence. These fabrications of Dr. Chabra's radiologic findings were an attempt by law enforcement to make them consistent with their theory which resulted in a false conclusion that Consuelo's death was the result of sexual abuse and violence.

113. On information and belief, Delano police officers and/or District Attorney investigators interviewed DRMC medical personnel and obtained the information regarding the lack of genital and anal injury when Consuelo was admitted. Despite such knowledge, Defendants did not provide such information or records to their experts, leading them to provide false conclusions based on their lack of knowledge of the DRMC medical records. Delano police officers and/or District Attorney investigators knew or should have known that it was critical to any reasonable medical determination to provide the complete medical records to experts, with whom on information and belief they interacted and falsely

THIRD AMENDED COMPLAINT FOR DAMAGES

communicated the impression that Consuelo had the injuries observed at KMC and UCLA at the time of her admission to DRMC.

>    2.  *Additional Information Regarding Consuelo's Medical Treatment At KMC and UCLA.*

114. Dr. Bloch, a surgeon at KMC, performed surgery on Consuelo on November 18, 1991. He noted (contrary to Dr. Dibdin's statements), after performing abdominal surgery, that Consuelo's colon was intact. Dr. Bloch was never advised of the DRMC initial assessment that there were no injuries to Consuelo's genitalia or anus upon her admission. He concluded and reported (and ultimately testified) that he observed blood in her abdomen; a severed pancreas and duodenum; and old scarring and adhesions between the colon and liver. Dr. Bloch concluded that these injuries were indicative of some form of blunt force trauma to the abdomen.

115. On November 20, 1991, Dr. Shaw at UCLA performed surgery on Consuelo's abdomen. In doing so, he examined her colon and also found it intact. He also performed an anoscopy and found that Consuelo's rectum and anus had no signs of lacerations. Although Dr. Dibdin falsely stated that the lacerations and injuries to the anus he observed were the result of traumatic injury of the anus as a result of sodomy, no such reference of lacerations was made by Dr. Shaw when he conducted his examination on November 20, 1991, although it clearly would have been referenced if the injuries were in fact present. On information and belief, Dr. Shaw inadvertently caused or contributed to the injury of the anus while performing an anoscopy on Consuelo on November 21, 1991. An anoscopy involves examination of the rectum by means of an instrument that is inserted into the anal opening.  An anoscope is too large to have been used on the rectum of a child Consuelo's age, and its insertion likely led to lacerations, particularly in light of Consuelo's compromised medical condition at that time.

THIRD AMENDED COMPLAINT FOR DAMAGES

116. Dr. Bentson, chief of neuroradiology at UCLA Medical Center ("UCLA"), did a Computerized Tomography (CT) scan taken on November 21, 1991, of Consuelo's brain. Dr. Bentson observed bilateral watershed brain infarcts of the parietal occipital area of Consuelo's brain. He concluded that these infarcts were attributable to the child being suffocated. Dr. Bentson's conclusion was based solely on his review of the CT scan. He never reviewed any medical records or medical history of Consuelo and her hospital treatment prior to the CT scan. Had Dr. Bentson been provided Consuelo's full medical record, including from DRMC, he would not have interpreted the scans to show signs of suffocation but rather as indicators of Consuelo's deteriorating medical condition.

  3. *Dr. Dibdin Provided False Evidence, Either Deliberately Or With Reckless Disregard Or Deliberate Indifference, That Consuelo's Cause Of Death Was Blunt Force Trauma To The Anus Resulting From Sodomy.*

117. Dr. James Dibdin, a forensic pathologist regularly employed by Kern County, conducted the autopsy of Consuelo on November 26, 1991. Dr. Dibdin falsely asserted in the autopsy or other reports he provided (written or verbal) that the cause of death was blunt force penetrating injury of the anus resulting from sodomy. He falsely asserted, and reported to District Attorney investigators and others in the District Attorney's Office, that the cause of death was blunt force penetrating injury of the anus; that Consuelo's internal injuries were the result of sodomy; that the microscopic tissue slides had evidence of acute and chronic trauma to the anus and genitalia; that the subdural hematoma and rib fractures he observed during the autopsy were a direct result of squeezing and shaking; and that the pattern of injuries that the child displayed was indicative of Shaken Baby Syndrome. He falsely characterized and described fractures he purportedly observed. He subsequently testified to these conclusions at the trial.

THIRD AMENDED COMPLAINT FOR DAMAGES

118. Particularly in light of the fact that much of what Dr. Dibdin asserted was medically impossible, he was aware that many of his findings were false and intentionally falsified his findings in his reports. *Inter alia,* Dr. Dibdin knew or should have known that the cause of death was impossible; that the muscles of the anus had not been torn; that the lax anal tone was a common postmortem effect; that the microscopic slides did not support his rib fracture findings; and that the alleged slides of the anus and genitalia were of the intestine and consequently that there was no microscopic evidence of old or new sexual trauma.

119. The sole medical professional who testified at trial about sexual assault against Consuelo, but did not subsequently recant his testimony, was Dr. Dibdin. His testimony was completely refuted by the evidence from the other medical professionals who provided evidence for the habeas proceedings.

120. Detective Bresson testified at the preliminary hearing that Dr. Dibdin had previously told him the cause of death was "blunt force penetrating injury to the anus." Dr. Dibdin's  theory that anal penetration also caused the injury to the upper abdominal contents was false and manufactured.

121. On information and belief, Dr. Dibdin intentionally delayed preparation of the autopsy report in order to manufacture evidence. Defendant detectives and investigators developed the theory that Consuelo was raped and sodomized to the point of causing abdominal injury and death on November 18, 1991, merely one day after suffering her injuries. Even though this cause of death was medically impossible, Dr. Dibdin provided support for this cause of death in the autopsy report. By doing so, he also provided false evidence which the prosecution was able to argue supported a special circumstance finding to support the imposition of the death penalty. Dr. Dibdin therefore completed the autopsy report not from his findings, or from what he observed in his examination of Consuelo's body or other medical records, but according to the

THIRD AMENDED COMPLAINT FOR DAMAGES

proposed theory of prosecution presented by the Defendant detectives and investigators.

122. Dr. Dibdin falsely attributed the injuries of the genitalia he observed during the autopsy to rape and mischaracterized the severity of the injuries. He noted in his autopsy report a one-half inch laceration of the "posterior wall of the vaginal opening" and an abrasion of the skin between the vagina and anus. The vaginal tear was, in fact, in the posterior fourchette, an external area of the genitalia. The tear was also relatively small and entirely inconsistent with penetration of the vagina by a penis or similarly sized object, which would have resulted in extensive laceration of the vagina and external genitalia. On information and belief, this injury was caused by a catheter during the repeated attempts at catheterization at DRMC and KMC. (Dr. Dibdin falsely cited this injury in his testimony as evidence of vaginal penetration and characterized it as "quite a large laceration.")

123. Dr. Dibdin falsely reported (and later falsely testified) that he observed swelling only around Consuelo's genitalia and anus, when in fact she had severe swelling over her entire body as is apparent in the photographs of Consuelo taken at UCLA. The more pronounced swelling around her genitalia and anus is due to gravity, which is well-known, common medical knowledge. Dr. Dibdin and others manufactured the false medical assertions of severe swelling in order to falsely assert and corroborate that Consuelo had internal tears of her vagina and rectum that indicated she had been vaginally and anally penetrated with a penis or similar size object.

124. According to Dr. Dibdin's false reports (and later false testimony), Consuelo had tears in her anus, vagina, and urinary bladder, which he observed from microscopic slides he reviewed during the autopsy.

THIRD AMENDED COMPLAINT FOR DAMAGES

125. Tissue slides of Consuelo's perineum, however, developed by the Kern County Coroner's Office, contain no evidence of tears or scarring, either new or old. The slides solely have evidence of hemorrhage. In some areas, this hemorrhage was up to two days old, and in another area, the evidence of hemorrhage was no more than ten days old. This older hemorrhage present in the slides was the result of massive bleeding in Consuelo's abdomen during her eight days of hospitalization and her acute state of DIC. The hemorrhage that was present was not evidence of penile penetration and was, on information and belief, the result of internal bleeding from her abdominal injuries and DIC.

126. Dr. Dibdin also falsely reported that he had observed severe lacerations of the anus that were evidence of sodomy. He stated that these lacerations were so severe as to have cut completely through the anal sphincter muscle. However, as explained previously, the staff in the DRMC and KMC emergency rooms did not note these tears, despite ample time and opportunity to do so. Had such tearing been present, particularly lacerations of the severity Dr. Dibdin described in his report and later testimony, they would have been observed in these examinations and noted in medical records.

127. Dr. Dibdin also falsely attributed the laxity of the anal sphincter he observed on autopsy to traumatic injury of the anus as a result of sodomy. According to him, the lacerations went completely through the sphincter muscle, causing the anus to become lax. These lacerations were not noted by Dr. Shaw when he conducted his examination on November 20, 1991 at UCLA. Laxity of the anal sphincter after death is a well-established and commonly known *postmortem* change. Dr. Dibdin's attribution of this change to sodomy was false.

128. Dr. Dibdin's false reports (and ultimate testimony) concerning the cause of Consuelo's abdominal injuries and her death were anatomically impossible. He asserted that Consuelo's internal injuries, including her

THIRD AMENDED COMPLAINT FOR DAMAGES

transected pancreas, duodenum, and transverse mesocolon, were caused by blunt force penetrating injury of the anus which caused lacerations of the anus and injury to multiple organs including the bowel and pancreas. Contrary to Dr. Dibdin's assertions, it is not possible for an object entering the rectum to cause injury to the abdominal contents without also causing a rupture of the wall of the rectum. Nor, contrary to Dr. Dibdin's assertions, is it possible for an object entering the rectum to cause injury to the pancreas, duodenum, and transverse mesocolon, which are located in the upper abdomen, without also causing injury to the organs in the lower abdomen, including the sigmoid colon. Several of the doctors who provided evidence at the habeas opined not only that they disagreed with Dr. Dibdin's conclusion that death was caused by "blunt force penetrating injury to the anus," but such an assertion was medically impossible. Dr. Shaw and Dr. Alonso explained that the cause of death was medically unsupported by the medical records and their observations.  As described previously, Dr. Harrison concluded it was medically impossible; Dr. Kennedy concluded there had been no vaginal or anal penetration; Dr. Heger concluded that Dr. Dibdin's opinion was absurd.

129. Dr. Dibdin also made false assertions concerning the location of Consuelo's rib fractures. The description of the location of the acute and healing fractures is not supported by the reports or testimony of any of the radiologists who examined Consuelo while she was hospitalized. The radiologists who examined Consuelo at DRMC, KMC, and UCLA had identified rib fractures inconsistent with Dr. Dibdin's claims. On information and belief, this material medical inconsistency was known to the Defendant DA investigators, law enforcement officers and Dr. Dibdin.

130.  According to Dr. Dibdin, Consuelo had acute rib fractures of ribs 6-10 on both sides of the body near the spine, as well as fractures of ribs 6-10 on

THIRD AMENDED COMPLAINT FOR DAMAGES

the right in the front. Dr. Dibdin also claimed that she had older healing rib fractures on ribs 8 and 9 on the left in the back. Dr. Seibly, a radiologist at KMC, however, found that the radiographs from KMC depicted fractures showing signs of healing in ribs 8-10 on the right rear, a location where Dr. Dibdin represented the fractures were recent and were not yet healing. Dr. Seibly noted also an acute displaced fracture of the left 8th rib in the front, where Dr. Dibdin had not seen any sign of fracture.

131. In providing the foregoing false evidence, Dr. Dibdin either deliberately provided false evidence, or provided false evidence with reckless disregard for, or deliberate indifference to, the truth and to Mr. Benavides' rights. Dr. Dibdin knew or should have known that Mr. Benavides was innocent and that he was manufacturing evidence to inculpate Mr. Benavides. Dr. Dibdin also knew or should have known that his consistent false and manufactured evidence would provide false evidence to be used to convict Mr. Benavides. Dr. Dibdin's false reporting described above, and the activities of the various Defendants identified above to elicit them, were furthered and relied on by prosecutors in initiating and/or furthering the prosecution, and were ultimately presented at Mr. Benavides' trial. Dr. Dibdin's false autopsy report (and possibly other reports) were reviewed and relied on by the other medical experts which resulted in them providing false opinions to, and false testimony for, the prosecution. Dr. Dibdin, and the detectives and investigators who facilitated and elicited this false evidence, were aware that such evidence was likely to influence a jury's decision in the prosecution against Mr. Benavides (which it in fact did). This evidence was material, and likely influenced the decision of the jury to convict Mr. Benavides.

132. On information and belief, Dr. Dibdin withheld exculpatory or potentially exculpatory evidence and information uncovered or observed during the autopsy from Defendant Carbone, or alternatively disclosed such information to

THIRD AMENDED COMPLAINT FOR DAMAGES

Defendant Carbone while Defendant Carbone was acting in an investigatory capacity. Any such exculpatory or potentially exculpatory evidence was not disclosed to the defense.

133. Dr. Dibdin was aware of the DRMC medical records, which had been provided to the Coroner's Office and which directly undermined and contradicted his autopsy conclusions, and intentionally or with reckless disregard for the truth and/or Mr. Benavides' rights omitted reference to them in order to support his false assertions regarding the cause of Consuelo's death.

> 4. *Dr. Diamond's Testimony At Mr. Benavides' Trial (which He Subsequently Recanted) Was False And Resulted From The Failure To Advise Him Of All Relevant Medical Evidence.*

134. As explained previously, Dr. Jess Diamond provided a report and ultimately testified that Consuelo had trauma to her genitalia resulting from rape, and to her anus, resulting from sodomy, even though this trauma was actually the result of her fragile medical condition and medical interventions administered after her arrival at the hospital. Dr. Diamond later agreed in his habeas declaration that the interior vaginal tear that had been reported to him and was the basis of his testimony that Consuelo had been raped, was unsubstantiated. Dr. Diamond further declared in his habeas declarations that the anal trauma he had observed was the result of medical interventions and her medical condition, documented in medical reports, which he had not reviewed prior to preparing his report and testifying at trial.

135. The anal tears Dr. Diamond observed were not noted earlier at either the DRMC or KMC emergency rooms and were not subsequently observed by Dr. Anthony Shaw of the UCLA on November 20, 1991, when he conducted an examination of Consuelo's anus and lower rectum. Nor were they apparent in photographs taken at UCLA on November 21, 1991. Any anal tears Dr. Diamond observed at the time of his examination on November 18, 1991

THIRD AMENDED COMPLAINT FOR DAMAGES

were superficial, since they were not visible to or noted by Dr. Shaw two days later. Severe lacerations of the anus would not have healed between Dr. Diamond's examination and Dr. Shaw's and would have likely become even more apparent given her inability to heal due to her DIC.  Dr. Kennedy opined that the superficial anal tears Dr. Diamond observed were most likely caused by insertions of rectal thermometers and digital examinations into her anus by medical personnel, including possibly Dr. Diamond. Dr. Diamond ultimately concluded in his habeas declaration that the superficial anal tears he observed were most likely the result of lichen sclerosus, a skin condition that causes the skin to become very thin, patchy, and reddened, and causes the skin to tear and bruise easily.

136.  Dr. Diamond's report and testimony that the anal laxity and anal dilation he observed was due to sodomy was erroneous.  After reviewing the medical records in habeas proceedings, which showed Consuelo had been administered paralytic medications shortly before his examination, Dr. Diamond concluded that the anal laxity and dilation he observed was a side-effect of such medication.

137. Dr. Diamond's report and testimony that the swelling of the anal margin he observed was the result of sodomy was also erroneous.  After reviewing the medical records in postconviction, Dr. Diamond opined that this swelling was the result of renal failure.

138. After reviewing the medical records in postconviction, Dr. Diamond concluded to a high degree of medical certainty that Consuelo had not been raped or sodomized.  Dr. Diamond, although misled in part by various Defendants' failure to advise him of the DRMC records and although he ultimately recanted his testimony, nonetheless exhibited a reckless disregard for, and

THIRD AMENDED COMPLAINT FOR DAMAGES

deliberate indifference to, the truth and Mr. Benavides' rights in making false medical assertions, including that Consuelo had been the victim of sodomy.

139. The Delano police detectives and District Attorney investigators knew or should have known, that Dr. Diamond's statements and conclusions were false or erroneous and were at least in part the result of his lack of knowledge of the DRMC records. They were aware from DRMC medical interviews and records they conducted or reviewed that, prior to Dr. Diamond's examination, medical personnel at DRMC and KMC had repeatedly and unsuccessfully attempted to insert a catheter into Consuelo's bladder to draw. On information and belief, these repeated and unsuccessful attempts to insert catheters, along with the intensive digital manipulation of the genitalia that catheterization requires, were the cause of the genital injuries he observed, a scenario not considered by Dr. Diamond. Further, the manipulation of the anus and insertion of a rectal thermometer at DRMC likely accounts for the superficial tears Dr. Diamond observed in his examination. The Delano police detectives and District Attorney investigators knowingly, recklessly or with deliberate indifference facilitated and promoted Dr. Diamond's false evidence and conclusions.

140. On information and belief, Defendant Carbone was aware of the contents of the DRMC medical records early in the case while acting in an investigative capacity, and, while acting in said investigative capacity, conferred with experts while they were developing their opinons, encouraging them to reach conclusions that he knew or should have known were false, and that they would have rejected had they been aware of the contents of the DRMC medical evidence. In engaging in such conduct, Mr. Carbone either intentionally acted with deliberate indifference to, and reckless disregard for, the truth and Mr. Benavides' rights.

THIRD AMENDED COMPLAINT FOR DAMAGES

5. *All The Foregoing False Evidence Was Used At Mr. Benavides'*
   *Trial, And Important Exonerating Evidence Was Not Presented*
   *At The Trial.*

141. The observations of the critical DRMC percipient witnesses to Consuelo's condition were never presented at trial. Significantly, the jury did not hear any testimony about the invasive medical treatment of Consuelo after her admission to DRMC that produced the "signs" of sexual abuse used as the primary evidence to convict Mr. Benavides. The jury similarly never heard that the cause of death about which Dr. Dibdin testified - blunt force penetrating injury of the anus - was anatomically impossible.

142. The prosecution persuaded the jury, through false medical testimony, that Mr. Benavides beat, shook, suffocated, squeezed, raped and sodomized Consuelo to death. The prosecution asserted that Consuelo sustained injuries to her abdomen, head, genitalia and anus. Through the testimony of Dr. Diamond, the prosecution claimed the alleged injuries that Dr. Diamond observed during his limited examination of Consuelo on November 18, 1991, were attributable to sexual assault, and, through Dr. Dibdin, claimed that Consuelo's injuries were the result of anal penetration and sodomy of a minor child and related conduct.

143. To further bolster the case against Mr. Benavides, the prosecution also elicited and presented to the jury false medical information from Dr. Dibdin and others that the injury to Consuelo's inner lip and bridge of her nose was a direct result of a hand being placed over her mouth. The prosecution argued this scenario was the method of suffocation used.

144. In addition, contrary to the prosecution's assertion that there was no evidence Consuelo suffered a seizure, the medical records from UCLA Medical Center are replete with notations of seizure activity observed in Consuelo.

145. The exculpatory evidence, reports, interviews and other material gathered throughout the Delano Police Department's and District Attorney's

47

1

2

Investigators' investigation that established the falsity of the evidence on which the prosecution was relying was never learned by the jury.

3

4

5

6

**I.    Kern County Forensic Pathologist Dr. Dibdin And The Kern County Coroner's Office Had A Pattern And Practice Of Providing False Autopsy Reports, And The Kern County Coroner's Office Deliberately And Indifferently Failed To Adequately Screen, Supervise and Train Its Employees.**

7

8

9

10

11

12

13

14

146. The case against Mr. Benavides was premised upon the false, unreliable and professionally irresponsible autopsy conducted by Dr. Dibdin. The Kern County Coroner's Office, through its employee, Dr. Dibdin, had a custom and practice of falsifying evidence in criminal cases in order to assist prosecutors in securing convictions. The Kern County Coroner's Office had a custom and practice of recklessly or deliberately indifferently providing false and unreliable reports and evidence to further the prosecution agenda of aggressively asserting child sexual abuse without ensuring the reliability of its evidence.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

147. Prior to being assigned the task of assessing Consuelo's injuries, Dr. Dibdin had a reputation for incompetence and unprofessionalism. His history included the following incidents of misconduct and incompetence. Prior to the events in this case, Dr. Dibdin (1) was fired from the Oklahoma City Medical Examiner's Office for the poor quality of his autopsies and for rendering erroneous causes of death; (2) was fired from his post as a Medical Examiner in Tasmania, Australia for unacceptable practices and giving erroneous causes of death; (3) was fired from the San Bernardino County, California, Coroner's Office for the poor quality of his forensic practices and for the poor quality of his determinations of the causes of death; (4) was fired from the Brown County, Wisconsin, Medical Examiner's office for falsely marking on death certificates that autopsies had been performed in cases when they had not and for offering questionable / factually incorrect causes of death; and (5) was suspended for a period of time from practice in the United Kingdom for dishonesty and lying under oath to a medical review

48

panel, the totality of which amounted misconduct, and he ultimately relinquished his license. Subsequent to the events in this case, Dr. Dibdin (1) was fired by the Kern County Coroner for questionable practices as a pathologist and for refusing to correct erroneous causes of death and correspondingly for having heated disagreements with staff in the Coroner's Office over causes of death where other staff members believed his findings were unsupported (although said termination was not for his unlawful conduct in this case); and (2) was terminated as coroner for Nevada County, California after he made incorrect and misleading cause of death determinations in several cases and refused to revise them when requested to do so by the County Coroner. *See James D. Dibdin, MD. v. County of Nevada, State of California, et al.,* Sacramento County Superior Court, Case No. 96-AS-01697.

148. Dr. Dibdin also incorrectly and falsely determined the cause of death in other cases involving children in Kern County. As in Mr. Benavides' case, Dr. Dibdin erroneously attributed the August 31, 1992, death of an 8-month-old boy to violent shaking. The boy's father told police he had attempted to resuscitate the boy by pressing on his chest and abdomen after he inexplicably stopped breathing. Dr. Dibdin concluded that this explanation was inconsistent with the injuries he observed at the autopsy. He testified at the father's trial that it would have taken 25 to 30 minutes for the boy to die as a result of his injuries. Witnesses testified that the father had been alone with the boy for no more than 15 minutes. In light of Dr. Dibdin's false testimony, the judge made the unusual move of dismissing the case prior to closing arguments for lack of evidence.

149. Defendants had or should have had reason to know at the time of Mr. Benavides' prosecution that there were serious problems with Dr. Dibdin's findings. In a very similar case in 1992, just one year prior to Mr. Benavides's trial, a Superior Court Kern County judge took the extremely unusual step of

THIRD AMENDED COMPLAINT FOR DAMAGES

dismissing murder charges against Teddy Charles Wilson, whom Dr. Dibdin had testified had killed his 8-month old son by violently shaking him, squeezing him so hard that he broke his ribs and lacerated his liver and pancreas, and possibly throwing him to the ground. After hearing all the evidence in a two-week trial, the court found there was insufficient evidence to submit the case to the jury and the court acquitted and released Mr. Wilson.

150. On information and belief, based on accusations made by Dr. Dibdin in 1996:

a. Dr. Frank Sheridan, the Coroner of San Bernardino County has described Dr. Dibdin's capabilities as a pathologist as follows: "Bad autopsies; cavalier attitude; flies into rages; generally no foundation for his cause of death; generally will guess at the cause of death and state it at the beginning of an autopsy. He does autopsies as fast as possible for monetary purposes. He jumps to preconceived notions in connection with autopsies. He's dangerous to have him work on an autopsy with you."

b. The pathologist of Riverside County, Dr. Detraglia, described Dr. Dibdin as a "disaster waiting to happen. He does fast autopsies and shoots from the hip."

c. Kern County ultimately refused to renew Dr. Dibdin's contract because of "questionable practices as a pathologist" and his "refusal to correct causes of death with the coroner, Helen Bruce Frankel."

d. Dr. Dibdin had "heated disagreements" with several members of the Kern County Coroner's Office, including Ms. Frankel, Ron Smith and/or John Van Rensslaer, and Mr. Dollinger.

e. Dr. Dibdin was asked to leave the University of Calgary without completing his residency there.

50

THIRD AMENDED COMPLAINT FOR DAMAGES

f.    Dr. Dibdin was let go or asked to leave the medical examiner's office in Oklahoma City, Oklahoma because Dr. Dibdin had been performing poor quality autopsies and rendering erroneous cause of death pronouncements as a pathologist.

g.    Two doctors from Oklahoma City (Dr. Jordan and Dr. Chapman) sent letters to the American Academy of Forensic Sciences seeking to have Dr. Dibdin's application rejected.

h.    Dr. Dibdin was asked to leave or resign his post in Tasmania, Australia because of unacceptable practices.

i.    Dr. Root, the coroner (pathologist) in San Bernardino County, California, terminated Dr. Dibdin several months after he started working for him for poor quality forensic practices and giving poor quality causes of death.

j.    Dr. Dibdin applied for but was rejected for employment by Dr. Detraglia as a pathologist in Riverside County.

k.    Dr. Dibdin was asked to leave Brown County Wisconsin as the Brown County Pathologist because, among other things, he was involved in marking death certificates stating that there were autopsies done when none were in fact performed.

l.    Dr. Dibdin was fired in 1996 as a pathologist in Nevada City. In one case, the Nevada County Coroner stated that Dr. Dibdin "provided an autopsy report with questionable findings, not even considering the toxicology report." When the Coroner asked Dr. Dibdin to reconsider his findings in light of the toxicology report, he refused. The Northern California Forensic Pathology (NCFP) group reviewed the case and determined that Dr. Dibdin's cause of death is "simply not supported by either the autopsy findings or the clinical course of the patient."

51

THIRD AMENDED COMPLAINT FOR DAMAGES

The Nevada City Coroner rejected his opinion and adopted that offered by NCFP.

151. Dr. Dibdin's autopsy report concerning Consuelo's death fits into this pattern of unprofessionalism and is fundamentally unreliable, as he did not prepare it until January 21, 1992, nearly *two months after* November 26, 1991, the date on which he conducted the autopsy. Rather than a direct record of his observations, this report was a reconstruction based upon Dr. Dibdin's memory of the autopsy, and as such was unreliable.

152. On information and belief, Kern County officials either knew, or should have known with minimal investigation, of these deficiencies. In hiring and supervising Dr. Dibdin, Kern County officials were deliberately indifferent to, and exhibited a reckless disregard for, the truth and the rights of criminal defendants, and to the risk of false evidence being used by Dr. Dibdin to inculpate Mr. Benavides and others. The Coroner's Office lacked policies, procedures and guidelines to ensure that false evidence was not used by its staff. Doe Defendant supervisors of Dr. Dibdin were deliberately indifferent to these risks even though, on information and belief, they were or should have been aware of Dr. Dibdin's custom and practice of falsifying evidence.

**J.    The Kern County District Attorney's Office Lacked Policies And Procedures To Prevent The Use Of False Evidence And Ensure The Disclosure Of Exculpatory Evidence And Had A Custom And Practice Of Using False Evidence And Suppressing Exculpatory Evidence.**

153. As is elaborated in the Fifth Cause Of Action (*Monell* liability against the Kern County District Attorney's Office and County of Kern), Kern County lacked any policies, procedures or systems, including proper hiring, supervision and/or training, to prevent the use of false evidence and the suppression of exculpatory evidence, especially in child molestation cases. As a result, it systematically deprived defendants of their due process right to a

THIRD AMENDED COMPLAINT FOR DAMAGES

fair trial. Plaintiff previously addressed the false evidence used by Dr. Dibdin. In this section, Plaintiff elaborates on the exculpatory evidence suppressed in this case as a result of the District Attorney's unconstitutional practices. The responsibility of ensuring that proper policies, procedures, systems, and supervision were in place rested with the elected Kern County District Attorney, who had the sole responsibility for establishing and implementing such policies, procedures, systems, and supervision. In fulfilling that responsibility, the elected Kern County District Attorney acted and acts as a County agent in contrast to the prosecution of individual cases, in which the elected Kern County District Attorney acts as an agent of the State of California. This claim is premised solely on the Kern County District Attorney's administrative, supervisorial and/or general policy responsibilities. The recitation of the withheld exculpatory evidence in the following sub-section is to illustrate how and why these failures and custom and practice presented and were material in this case.

1. *The District Attorney's Office Failed To Disclose Evidence From The Crime Lab That Was Consistent With Mr. Benavides' Statements That He Found Consuelo Outside.*

154. Jeanne Spencer, a Kern County Criminalist, testified that, when she analyzed tissue containing vomit she found at Ms. Medina's apartment, she did not find any dirt or gravel consistent with it having been cleaned up from outside. Rather, she said she found nylon tri-level carpet fibers in the vomit indicating contact with some carpet-like fiber.

155. The prosecution argued during closing argument that this evidence contradicted Plaintiff's statement that he had found Consuelo laying outside the front door. In fact, Spencer's lab notes, which were not disclosed to the defense at or before trial, indicated that she found "small dirt particles" in a napkin in the kitchen wastebasket that was consistent with a tape lift from outside.

THIRD AMENDED COMPLAINT FOR DAMAGES

156. Spencer found dirt and debris in the napkins in the bathroom wastebasket. Her lab notes and photographs also showed that Consuelo's sweatshirt contained plant fibers, and that blood on Consuelo's shoe sole picked up dirt and gravel. All of this evidence was consistent with Mr. Benavides version of events, that he had found Consuelo outside the front door. None of this evidence was disclosed to the defense.

157. The defense was unable to counter the prosecution's challenge to Mr. Benavides' statements at trial that he had found Consuelo outside. Mr. Benavides' credibility was significantly undermined by the misleading forensic evidence produced at trial that there was no evidence Consuelo had been outside. Had the prosecution disclosed these reports, the defense would have been able to support Mr. Benavides' statements, bolstering his credibility and corroborating his statements for the jury. Therefore, had this evidence been disclosed, the jury would have had greater reason to believe Mr. Benavides' version of events, changing the outcome of Plaintiff's trial. Law enforcement reports and notes, withheld from the defense, confirmed the existence of dirt and debris in the vomit found in the kitchen garbage can, lending credence to Plaintiff's version of events and directly undermining the prosecutor's argument.

### 2. Medical And Other Evidence Favorable To Mr. Benavides' Defense Was Withheld.

158. The prosecution presented false testimony that Consuelo was in good health prior to November 17, 1991 and failed to disclose information that indicated possible causes of her injuries other than abuse by Mr. Benavides. At trial the prosecutor informed the jury that Consuelo was a "completely normal" twenty-one-month-old who was harmed by Plaintiff on November 17, 1991. He argued that the injuries allegedly inflicted by Mr. Benavides that night were connected to old injuries that he also inflicted upon her.

54

159.  In contrast, District Attorney investigators were aware of numerous statements by Consuelo's caretakers making clear that she had significant, chronic health problems prior to November 17, 1991, which had no connection whatsoever to Mr. Benavides. On information and belief, this information was never presented to the prosecutor. Alternatively, if it was provided to the prosecutor, it was provided while he was working in an investigative capacity.

160.  Delia Salinas, Ms. Medina's sister, told district attorney investigator Ray Lopez on May 14, 1992, that Consuelo was a "smart and lovable child who was clumsy and fell down a lot. She was an active child who bruised herself often, mostly on her legs." Diana Alejandro, Ms. Medina's other sister, also told Lopez on May 11, 1992, that Consuelo "was always rashed [i.e. she always had a rash] when she was living down ... on 1313 Albany." Diana explained that Consuelo always had a rash because her diaper was not changed at night by members of the Alejandro family.

161.  Ms. Medina told the Delano Police and district attorney investigator Bresson that Consuelo was "always falling down, she's always getting into things. Even at my mom's house, you know, she's always bumping, she falls." None of the above statements were provided as evidence at trial.

162.  Relying on this false and fabricated foundation regarding Consuelo's physical condition, the prosecution argued at trial that Consuelo's injuries on November 17, 1991 were not typical of her physical limitations and chronic illness, but rather were the culmination of Mr. Benavides' violent tendencies and only began after he met Consuelo. During his questioning of Ms. Medina, the prosecutor implied that Consuelo began to get injuries only after Mr. Benavides came to live with her and her daughters, thereby implying that Mr. Benavides had been the cause of all of Consuelo's past injuries and illnesses:

Carbone:     "Ms. Medina, isn't it true that you knew what was

happening with this man but you weren't reporting it?"

Ms. Medina: "No, I didn't." [meaning that she did not report it]

163.  Moreover, Mr. Benavides was unlawfully denied access to exculpatory material evidence proving that no semen was ever found on or in Consuelo. Prevailing practice in Kern County in 1991 was for law enforcement to obtain samples of fluids from suspected sexual assault victims using a law enforcement "rape kit." Contrary to practice, although Consuelo was hospitalized within minutes of the alleged rape and sodomy and examined by the County's sex abuse expert, the prosecution asserted at trial that no such sampling was performed. Dr. Diamond testified that he did not perform a rape kit to test for the presence of semen in Consuelo's vagina and rectum because the blood oozing from them would have washed away any traces of semen that had been present. Dr. Kennedy explained that it was highly unlikely that all traces of semen would have washed away and that Dr. Diamond's failure to perform a rape kit fell below the standard of care.

164.  Given the prevalence of the Kern County District Attorney's Office of engaging in unconstitutional investigatory practices in child molestation cases, and the immediate determination of law enforcement that Consuelo had been the victim of a sexual assault, the failure to use a "rape kit" is highly suspect. Moreover, in light of the prosecution's callous disregard for fundamental fairness with respect to withholding *Brady* material, manufacturing testimony, and presenting false evidence, the prosecution's statement was not supportable.

165.  On information and belief, the prosecution did obtain a rape kit and withheld the results from the defense because they were exculpatory. In the alternative, if there was no rape kit, it was not done in order to prevent the presence of exculpatory evidence favorable to Mr. Benavides.

THIRD AMENDED COMPLAINT FOR DAMAGES

166.  Furthermore, the Delano Police officers suspected that Mr. Benavides had committed a crime in Mexico and contacted the Mexican Federales for information regarding him. They were never able to corroborate statements that he had committed prior crimes. Indeed, the prosecution stipulated at trial at the Court's urging that Mr. Benavides had no prior felony convictions and no prior instances of violence or threats of violent conduct.

167. Nonetheless, the prosecutor knowingly made false statements when he alleged that Mr. Benavides had committed prior similar crimes. These statements contaminated the jury's view of the evidence and affected its determinations during both the guilt phase and penalty phase of trial.

168.  The prosecutor knew at the time he made these statements that they were false. Statements of several critical witnesses in the case, obtained by and in the possession of the prosecution, all contradicted the prosecutor's assertions that Mr. Benavides was a child molester. Several witnesses told the prosecution that he did not have the character of a molester, had never been known to harm children, was gentle and kind with children, and did not get angry or violent.

169.  Ms. Medina stated in every recorded interview with the Delano police and the district attorney's office that she did not and could not believe that Mr. Benavides had in any way harmed her children. In her first interview she told the police, "I would never protect him. But I never, I swear to God, I never saw him do anything to my daughters like that. He loved her, he loved my baby." Eight months later, in an interview with a district attorney investigator, she told him "he never hit me, he never hit the girls. He ... treated the girls, you know, nice, like when I was, would be tired and he was home, he would feed the girls, he would make them something to eat.... He never

mistreated them." She also said she had "no indication whatsoever" that would have indicated Plaintiff was molesting her daughter.

170. The prosecution withheld from the defense the statements of Mr. Benavides' brother Manuel Benavides that Plaintiff was not a child molester, was a gentle man, was very caring of small children, and was non-violent, even when drunk. Many other witnesses interviewed by Defendants provided similar character references. These exculpatory statements were in the possession of the prosecution before trial. As a result of their nondisclosure, defense counsel did not present as character evidence the compelling statements of his brother who had regular contact with Mr. Benavides while he was around Consuelo, and who firmly believed he could not have harmed her, or any other child. Further, defense counsel did not present the testimony of Mr. Benavides' other brother, Evaristo Benavides, who had known him all his life, and who had several daughters who had grown up around Mr. Benavides without incident. While presumably Mr. Benavides was aware of his brother's opinions, the Defendants still had an obligation to provide this exculpatory evidence.

171. Moreover, the prosecution further failed to disclose and withheld from the defense any documentation of the second sex abuse exam of Cristina, conducted on December 10, 1991, by Dr. Diamond at KMC, at the request of Delano Police Department Detective Nacua. Dr. Diamond's report of this exam was exculpatory in that it confirmed that Consuelo's sister Cristina showed absolutely no physical signs of sex abuse or molestation and that Cristina denied ever having experienced sex abuse or molestation. On information and belief, Detective Nacua did not disclose this evidence to the prosecutor, or alternatively it was provided while he was working in an investigative capacity.

172. Withholding this exculpatory report prevented the defense from knowing that the exam had been conducted, and that it had conclusively

58

established that Cristina had not been molested. This was highly prejudicial in light of the fact that the prosecution argued to the jury that Mr. Benavides had molested Consuelo and at least implied that he had molested Cristina.

173.  The prosecution withheld from the defense voluminous materials, containing overwhelming amounts of exculpatory evidence, especially evidence of State misconduct. Documents withheld included evidence that contradicted or undermined the autopsy report findings presented by the prosecution and evidence that the prosecution manufactured medical evidence.

174.  The prosecution also withheld documents that Consuelo's prior and current injuries were most likely attributable to individuals other than Plaintiff, and/or to causes other than rape and sodomy.

175. On information and belief, Deputy District Attorney Carbone knew that the mechanism that caused Consuelo's death testified to by Dr. Dibdin was false. At the preliminary hearing, Dr. Diamond testified that blunt force anal trauma caused the abdominal injuries.  At trial, Mr. Carbone elicited testimony from Dr. Diamond explaining that he had changed his opinion regarding the cause of death after learning that information Dr. Diamond had previously been provided about a tear to the rectum was false. Dr. Diamond testified he now believed the cause of death was blunt force trauma to the abdomen.  The prosecution failed to provide the defense with any discovery indicating who told Dr. Diamond the erroneous critical information about an alleged tear in the rectum prior to the preliminary hearing, who retracted that information, and when Dr. Diamond changed his opinion.  On information and belief, Mr. Carbone did not provide this information to the defense because he knew that the absence of a hole in the rectum completely discredited Dr. Dibdin's theory of the cause of death.

176.  The prosecution withheld a case report dated September 4, 1992, in which the prosecutor Robert Carbone harassed UCLA witnesses and pressured

59

THIRD AMENDED COMPLAINT FOR DAMAGES

them to give statements regarding the case, thereby acting as an investigator by engaging in conduct more often associated with law enforcement. Specifically, on September 4, 1992, Deputy District Attorney Carbone went to UCLA with investigator Ray Lopez and attempted to interview Rick Harrison, Joylene Martinez, and Debra Ridling. When they stated they did not want to talk with him, District Attorney Carbone became very hostile, raised his voice at the witnesses, and was verbally abusive towards them. He engaged in these actions in his investigative capacity.

177.  The report indicates that Deputy District Attorney Carbone and Investigator Lopez immediately requested to speak with the hospital administrator, and subsequently spoke to the patient relations liaison and then legal counsel. Due to his coercive tactics, legal counsel suggested to Harrison and Ridling that they talk to Deputy District Attorney Carbone, and the patient relations liaison for the hospital called Ridling into her office and required her to assist District Attorney Carbone. Harrison felt threatened enough to call hospital security and District Attorney Carbone's supervisor in Kern County.

178.  Had this report been disclosed to the defense, the defense would have impeached not only Dr. Harrison, but also other UCLA witnesses and other medical and non-medical witnesses by questioning them regarding the tactics used by the prosecution to interview them and obtain their testimony. In conjunction with the misconduct engaged in by the prosecution with respect to obtaining Cristina's testimony and Ms. Medina's testimony, this incident demonstrated the manipulative efforts in which the prosecution engaged in to obtain information it deemed inculpatory.

179.  Medical records indicate that four CT scans were conducted of Consuelo. Only one was disclosed to the defense. The suppressed CT scans had material information that could have been used by effective counsel to refute the

THIRD AMENDED COMPLAINT FOR DAMAGES

prosecution's theory that Consuelo was suffocated. Had the additional CT scans conducted at UCLA been disclosed, they would have confirmed that Consuelo's brain injuries were secondary to her loss of oxygenated blood supply that resulted from her abdominal injuries; and thus, shown that the injuries were not the result of suffocation. The evidence of suffocation was extremely prejudicial as it was used by the prosecutor to argue that Mr. Benavides suffocated Consuelo while he was sodomizing her to prevent her from screaming and being heard by the neighbors.

180.  Those Defendants who knew of them withheld evidence of interviews of medical personnel, including Anne Tait, Richard Harrison, and defense expert Warren Lovell because they produced exculpatory information.

181.  Those Defendants who knew of them failed to disclose an interview of Dr. Anne Tait of DRMC by Gregg Bresson on December 11, 1991. Investigator Bresson stated in his testimony that he had interviewed Dr. Tait, a doctor at DRMC who observed no tearing, bleeding, swelling, or discharge consistent with sexual abuse when she treated Consuelo on November 17, 1991.

182.  The defense was therefore prevented from impeaching Dr. Tait with her statements that she had not seen evidence of sex abuse when she treated Consuelo. Had Dr. Tait's exculpatory statements been disclosed, the defense would have powerfully countered the prosecution's cause of death evidence with affirmative statements that  there was no evidence of rape or sodomy within the first several hours after Consuelo was injured and would have demonstrated that the prosecution was presenting false testimony that Consuelo had been sexually abused.

183.  Those Defendants who knew of it failed to disclose evidence that, on December 10, 1991, Investigator Bresson had spoken to Dr. Rick Harrison, a doctor who treated Consuelo at UCLA. Investigator Bresson stated in his testimony that he was referring to a report of this interview, but the report was not

THIRD AMENDED COMPLAINT FOR DAMAGES

disclosed to the defense. The defense was therefore prevented from using the report to counter the prosecution's cause of death evidence with Dr. Harrison's statements that he believed the cause of Consuelo's injuries and death was blunt force trauma to the abdomen, and not sodomy and rape. Had the report been disclosed, the defense would have impeached Dr. Harrison with his statements that undermined the prosecution's cause of death.

184.   The district attorney, Robert Carbone, contacted defense expert Warren Lovell on April 8, 1993, and did not report the substance of this contact. In questioning Lovell, Carbone implied to the jury that Lovell had been fired from his position as Chief Medical Examiner in Ventura County. Lovell had told Carbone prior to this, however, that he had not been fired from his job. Had the prosecution disclosed the contents of this phone conversation, the defense could have used it to successfully object to the implications of his questions as lacking a reasonable basis and an example of misconduct. Because it was not disclosed, the defense objection was overruled. Had the evidence been available, the defense could have countered the prosecution's implications.

185.   The prosecution also withheld evidence of prior interviews with Mr. Benavides' mother. On April 13, 1993, during trial, Detective Al Valdez of the DPD approached Plaintiff's mother and asked to interview her. He said to her "Maria, it's a while I've been here, right?" - implying that he had visited her before, a while ago. Valdez stated that this interview reconfirmed a prior interview in which an audiotape malfunctioned. On information and belief, said prior interview audiotape exists (or existed) and was never disclosed to the defense. Valdez stated at trial that he was reading from a declaration signed by Maria during that prior interview. In this interview, Valdez discussed Mr. Benavides' description of what happened to the little girl, and the specific description of events Plaintiff gave his

mother regarding these events. No prior contact between Maria and Valdez was reported to the defense, and no declaration was ever disclosed.

186.  The prosecution failed to report prior conversations with Ms. Medina, Cristina Medina, Diana Alejandro, and other members of Consuelo's family. On November 26, 1991, Investigator Gregg Bresson and Prosecutor Carbone (acting in an investigative capacity) were at UCLA Medical Center, where they talked with Ms. Medina and her son, Ruben Verdugo, about Consuelo, Mr. Benavides, and his case. This contact went unreported. Ms. Medina was questioned regarding allegations that Cristina had blood in her underwear and Mr. Benavides' decision to return to the United States from Mexico early that year.

187.  Exculpatory evidence discussed during this conversation, such as Mr. Benavides' real reason for returning early to the United States, was not reported. Had the prosecution disclosed this evidence, the defense would have been able to prevent the prosecutor's misconduct at trial when he falsely implied that Mr. Benavides had returned early from Mexico because he was wanted by authorities there for doing something similar.

188.  On July 21, 1992, Vicky talked with Kern County Investigator Ray Lopez about a prior interview of Cristina conducted by Detective Al Valdez in which Valdez discussed the concept of rape with Cristina. Before and after that date, Ray Lopez visited Cristina regularly at the house of her cousin and aunt, in attempts to prepare her interview and trial testimony. Investigator Gregg Bresson also met with Cristina on December 20, 1991 to obtain forensic evidence. No evidence of these interviews was disclosed before trial. Had evidence of these interviews been disclosed, the defense would have been able to adequately challenge the prosecution's improper removal of Cristina from her home that was orchestrated in order to coerce and manufacture her testimony for trial, as well as

THIRD AMENDED COMPLAINT FOR DAMAGES

coerce her mother's statements. Had this evidence been disclosed, the outcome of the trial would have differed.

189.  The prosecution withheld voluminous documents at trial, including evidence supporting Mr. Benavides' statements at trial regarding the facts of the incident, documents illustrating the false medical testimony manufactured and introduced by the prosecution, and information provided by friends and family of Mr. Benavides that was exculpatory. The disclosure of this information, alone and in combination, would have changed the trial outcome.

190. As the term "the prosecution" is used herein, it encompasses any member of the prosecution team, including detectives and investigators. It does not imply by its terms whether the particular information was in fact known to Mr. Carbone, who prosecuted the case.

191. The foregoing information either a) was not disclosed to the prosecutor by the detectives or investigators who learned it; b) or it was provided to the prosecutor while he was working in an investigative capacity; or c) to the extent that any exculpatory evidence was withheld by the prosecutor acting in his prosecutorial capacity, the District Attorney's Office is liable for its failure to have in place procedures and systems to ensure that consulting experts were advised of all relevant and important information, and its failure to ensure the integrity of its investigations and to prevent reliance on false evidence. Further, the District Attorney's Office is liable for its failure to implement policies, systems and oversight to ensure that material evidence was provided to defendants, particularly in sexual molestation cases.

192. All of the evidence describe herein was material, i.e., there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" of a different result exists where evidentiary suppression undermines confidence in the

THIRD AMENDED COMPLAINT FOR DAMAGES

outcome of the trial. Evidence is material if, in the absence of the disclosure, the defendant did not receive a fair trial, which means a trial resulting in a verdict worthy of confidence.

### K.    The Prosecution Prejudicially Failed To Disclose Benefits Offered To Witnesses In Exchange For Their Assistance With The Case.

193.    The prosecution presented the testimony of Darlene Salinas ("Darlene") and Virginia Salinas ("Vicky") at the penalty phase of the trial. Darlene helped the prosecution make its case for the imposition of death when she testified that Consuelo's family wanted "justice" to be done and stated that "nothing like this should happen to children again." Vicky testified that she took care of Cristina after her sister's death and described the impact of Consuelo's death on Cristina.

194.    District Attorney investigators Lopez and Bresson arranged for Cristina to be removed from Ms. Medina's custody, which led to her eventual placement in the custody of Darlene and Reynaldo Salinas and later Vicky. These relatives received financial rewards in the form of welfare assistance for taking custody of Cristina. Ms. Medina was the subject of a lawsuit filed by the District Attorney's Office for an order requiring her to pay child support to her relatives for the involuntary removal of Cristina from her custody. These benefits provided an incentive for them to cooperate with the prosecution. The District Attorney's office filed lawsuits against Ms. Medina to obtain welfare benefits for both Vicky and Darlene. This enabled Vicky to receive welfare benefits in the form of cash payments.

195.    The prosecution was aware that both Darlene and Reynaldo Salinas had criminal records indicating a history of drug abuse. The prosecution overlooked their drug problems and other criminal convictions that indicated they were not safe placements for Cristina, in exchange for their cooperation and assistance with

THIRD AMENDED COMPLAINT FOR DAMAGES

their investigation and their testimony at trial. This also bestowed a benefit onto Darlene and Reynaldo Salinas by assisting them in overcoming obstacles to receiving welfare benefits, such as a criminal and drug history, that they otherwise would not have been able to overcome.

196. At no time did the prosecution disclose to the defense the fact that Ms. Medina was sued for child support by the Office of the District Attorney for welfare benefits given to Darlene Salinas and Vicky Salinas while the case was pending.

197. The explanations at the conclusion of the preceding sub-section regarding the meaning of the term "prosecution," the alternative forms of the non-disclosure of the evidence, and the meaning of materiality apply to the foregoing evidence as well, and to any and all such references in this Complaint.

**L.    The Dismissal Of All Charges By The California Supreme Court.**

198. For over two and a half decades, Mr. Benavides continued to proclaim his innocence and fight for his freedom. On November 12, 2002, represented by the Habeas Corpus Resource Center ("HCRC"), Mr. Benavides filed a Petition for Writ of Habeas Corpus in the Supreme Court for the State of California.

199. In response to the petition for habeas corpus relief, the Supreme Court issued an order to show cause on Mr. Benavides' claims that his convictions were based on, *inter alia*, false evidence. Before the Supreme Court issued its final decision, Respondent Secretary of the Department of Corrections and Rehabilitation conceded that false evidence was introduced at trial and that Mr. Benavides' convictions for first-degree murder, the substantive sexual offenses, special-circumstance findings, and the judgment of death must be vacated.

THIRD AMENDED COMPLAINT FOR DAMAGES

200.  On March 12, 2018, the Supreme Court filed its decision on the Habeas Corpus case, granting the petition for writ of habeas corpus and vacating in its entirety the judgment of conviction in *People v. Vicente Figueroa Benavides,* (Super. Ct. Kem County, 1993, No. 48266).

201.  The intentional and reckless acts and omissions of various officers and employees of the Delano Police Department, the Kern County District Attorney's Office, CPS, and the Kern County Medical Examiner's Office—acting in concert with law enforcement officers—caused Mr. Benavides to be wrongly convicted and sentenced to death.

202.  Absent the actions of Defendants and their co-conspirators, Mr. Benavides would not have been wrongly convicted for the death of Consuelo and sentenced to death.

203.  As a direct result of Defendants' misconduct, Mr. Benavides suffered injuries and damages including bodily and personal injuries; pain and suffering; mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation of himself and his family; degradation; restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, and family relations.

204.  Mr. Benavides now seeks redress for the egregious misconduct that cost him the best years of his life.

## VI.    PARTICIPATION, STATE OF MIND, CAUSATION AND DAMAGES

205.  All Defendants acted without authorization of law.

206.  Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

THIRD AMENDED COMPLAINT FOR DAMAGES

207. As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

208. Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

209. Each Defendant acted with a deliberate indifference to or, reckless disregard for, an accused's rights or for the truth in withholding evidence from prosecutors, and /or for the Plaintiff's right to due process of law.

210. The individual Defendants named herein, in engaging in the acts described, were not acting in a prosecutorial capacity but in an investigatory, administrative or supervisorial capacity.

211. As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff sustained the injurious events of his wrongful conviction, his sentencing to death, his denial of his appeal, and numerous discrete bodily and mental injuries throughout his imprisonment. Throughout Mr. Benavides' wrongful imprisonment, new and independent injuries were sustained for which the Defendants are directly responsible, including but not limited to Mr. Benavides' inability to grieve and loss of familial relations.

212. While wrongfully incarcerated, the extreme mental distress and anguish brought about by Mr. Benavides' imprisonment caused him numerous other bodily injuries while wrongfully incarcerated which were further exacerbated by poor conditions and improper medical treatment.

213. While Kern County and the City of Delano may not have intended or expected an innocent man would be convicted or sentenced to death or to inflict the injuries that Mr. Benavides sustained throughout his horrific ordeal, Kern County and the City of Delano,—through its actions and omissions—is responsible for all the great mental and physical pain, suffering, anguish, fright, nervousness,

anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension which Mr. Benavides sustained.

214. Due to the acts of the Defendants over decades, Plaintiff has suffered extreme and severe mental anguish as well as mental and physical pain and injury. For such injuries, Plaintiff has incurred and will incur in the future significant damages based on psychological and medical care.

215. Additionally, as a result of Mr. Benavides' wrongful incarceration, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

216. As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to raise a family.

217. The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith or done with reckless disregard or with deliberate indifference or with gross negligence to the constitutional rights of the Plaintiff, entitling Plaintiff to exemplary and punitive damages from each Defendant in an amount to be proven at the trial of this matter.

218. By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988 and California Civil Code §52.

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT FOR DAMAGES

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – FALSE EVIDENCE VIOLATIONS**

**(Against Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Estate of Jeffrey Nacua, Sarah Garcia Nacua, James Dibdin, Robert Carbone and Does 1-10)**

219. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

220. Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey Nacua, James Dibdin, Robert Carbone and Does 1 - 10, while acting under color of law, deprived Plaintiff of his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, by providing false non-testimonial evidence in reports and statements outside of live testimony that was forwarded to Mr. Benavides' prosecutor, which was likely to, and in fact did, influence the jury's decision to convict Mr. Benavides and resulted in a deprivation of liberty. The provision of such false evidence set in motion a reasonably foreseeable chain of events leading to the presentation of false evidence at Plaintiff's criminal trial.

221. Such false evidence includes but is not limited to:

 a. Dr. James Dibdin's false autopsy report which included anatomically and medically impossible conclusions, and related statements, findings and conclusions inconsistent with existing reports and information, and which were created and used to support the prosecution's false and contrived theory of the manner and cause of Consuelo Verdugo's death.

 b. The coerced and false addendum to the report of Dr. Chabra's radiological report indicating 2-3-week-old healing fractures to Consuelo Verdugo's 8th - 10th ribs on the right side of her body.

70

c.     The coerced and false statements of Ms. Medina and Cristina Medina, which were the product of coercive and abusive interview techniques, and threats, intimidation, and acts depriving Ms. Medina of lawful custody of Cristina Medina, and depriving Cristina Medina the lawful protection and guardianship by her mother, Ms. Medina, which were undertaken with the intent to produce false, inculpatory statements for use in Plaintiff's criminal trial.

d.     False evidence from medical personnel at KMC and UCLA resulting from the failure to provide those medical professional witnesses with contradictory evidence from the DRMC records and interviews that would have led them to different and exculpatory medical conclusions.

222.   Each Defendant knew or should have known such evidence was false, and the Defendants engaged in such conduct with deliberate indifference to and/or reckless disregard for the truth and for Plaintiff's rights secured by the United States Constitution and Amendments thereto.

223.   The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence used against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

/ / /

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT FOR DAMAGES

1
2
3
4

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – JOINT ACTION CONSPIRACY**

**(Against Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Estate of Jeffrey Nacua, Sarah Garcia Nacua, James Dibdin, Robert Carbone and Does 1-10)**

5
6

224.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

7
8
9
10
11
12

225.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey Nacua, James Dibdin, Robert Carbone and Does 1 - 10 were each jointly and severally responsible for ensuring they, and each of them, did not use false evidence against Plaintiff, and each engaged in the unconstitutional conduct alleged herein, and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

13
14
15
16
17
18
19
20
21
22

226.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey Nacua, James Dibdin, Robert Carbone and Does 1 - 10, acting under color of state law, conspired and agreed to deprive Plaintiff of his rights under the Fifth and Fourteenth Amendments to the United States Constitution against the creation and submission of false evidence, outside of live testimony which would result in a deprivation of liberty, because the provision of such false evidence would set in motion a reasonably foreseeable chain of events leading to the presentation of false evidence at Plaintiff's criminal trial.  Each creation or submission of false evidence and information, as well as any act related to such creation or submission of such information, constitutes an overt act in furtherance of said conspiracy.

23
24
25

227.  Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of the other, in failing to refrain from creating or submitting false evidence.

26
27
28

72

228.  As a result of the individual Defendants', and each of their, violations of Plaintiff's constitutional right against the creation or submission of false evidence, Plaintiff was damaged as alleged herein.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983 BRADY VIOLATIONS

**(Against Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Estate of Jeffrey Nacua, Sarah Garcia Nacua, James Dibdin and Does 1-10)**

229.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

230.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey Nacua, James Dibdin, and Does 1 - 10, while acting under color of law, and deliberately or with reckless disregard for, or deliberate indifference to, the truth or Mr. Benavides' rights, deprived Plaintiff of his civil right to have material exculpatory evidence and information turned over to prosecutors, for disclosure to defense and use in his criminal trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963).

231.  The actions of each defendant against whom this claim is made, in withholding evidence from prosecutors, and from defense counsel, were done with deliberate indifference to or reckless disregard for, Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution and were in violation of 42 U.S.C. § 1983.  Plaintiff brings this claim as both a procedural and substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to *Brady* information is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

232.  The acts violative of the mandate of *Brady v. Maryland*, 373 U.S. 83 (1963), include, but were not limited to:

a.      Nondisclosure of communications between the Kern County District Attorney's Office, Delano Police Department, Kern County Child Protective Services, and the juvenile court, demonstrating that these agencies conspired to and coordinated efforts in ensuring that Cristina Medina was removed from and remained out of the custody of Ms. Medina, her mother, until Ms. Medina and Cristina Medina manifested an intent to, and did, falsely communicate to law enforcement and/or testify to, a belief in the guilt of Plaintiff;

b.      Nondisclosure of documentation of one or more sex abuse examinations of Cristina Medina, conducted by Dr. Jess Diamond, which indicated that Cristina had suffered no prior sexual abuse;

c.      Nondisclosure of Criminalist Jeanne Spencer's reports and photographs of the evidence indicating findings of dirt, debris, and plant fibers on the person of Consuelo Verdugo, and at the scene, which was consistent with the defense theory of her manner and cause of death, and inconsistent with that of the prosecution;

d.      Nondisclosure of the substance of interviews with Consuelo Verdugo's prior caretakers relating to Consuelo's prior history of health problems, which was inconsistent with the prosecution's theory and trial argument that Consuelo Verdugo's injuries were ahistorical and the culmination of violent behavior visited upon her by Plaintiff over a period of time;

e.      Nondisclosure of exculpatory character evidence statements from interviews conducted by one or more Defendants;

f.      Nondisclosure of reports relating to the harassment and intimidation of healthcare providers at UCLA Medical Center by

74

THIRD AMENDED COMPLAINT FOR DAMAGES

Defendants Carbone and Lopez which were of impeachment value to the defense in challenging the testimony of the medical providers;

g.    Nondisclosure of medical records, information, and imaging, including at least three (3) Computerized Tomography scans of Consuelo which were of exculpatory value;

h.    Nondisclosure of interviews with Ann Tait, Richard Harrison, and Warren Lovell, which generated exculpatory information and evidence;

i.    Nondisclosure of evidence or information tending to show the lack of presence of any semen on the person of Consuelo, by performance of a rape kit, which was prepared customarily by Kern County employees or agents following suspected child abuse;

j.    Nondisclosure of statements of Ms. Medina, Cristina Medina, Diana Alejandro, and other members of their family, which produced exculpatory information relating to the presence or non-presence of blood in Cristina's underwear at some point in time, the real reason for Plaintiff's return to the United States from Mexico, and impeachment information relating to the preparation of Cristina for testimony at trial;

k.    Nondisclosure of true findings of Defendant James Dibdin's autopsy examination of Consuelo Verdugo.

233.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey Nacua, James Dibdin, and Does 1 - 10, were each jointly and severally responsible for providing material exculpatory information to the prosecutors, in order that it could be provided to defense counsel.  Each responsible Defendant knew or should have known of the materiality and exculpatory nature of the evidence or information withheld, and the unconstitutional nature of such withholding of said information, and with knowledge, failed to prevent such withholding of evidence

75

1  or information, which each had a responsibility to do, and each ratified, approved

2  or acquiesced in it.

3      234.  As result of the individual Defendants', and each of their, violations of

4  Plaintiff's constitutional right to disclosure of known material, exculpatory

5  evidence or information, Plaintiff was damaged as alleged herein.

6  ## FOURTH CLAIM FOR RELIEF
7  **42 U.S.C. § 1983 – RECKLESS INVESTIGATION IN VIOLATION OF MR. BENAVIDES' DUE PROCESS RIGHT TO A FAIR TRIAL**

8  **(Against Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Estate of**
9  **Jeffrey Nacua, Sarah Garcia Nacua, James Dibdin and Does 1-10)**

10     235.  Plaintiff realleges all the foregoing and any subsequent paragraphs

11 contained in the Complaint, as if fully set forth herein.

12     236.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey

13 Nacua, James Dibdin, and Does 1 - 10, were jointly and severally responsible as

14 investigative law enforcement actors assigned to Plaintiff's criminal investigation,

15 to share material case information with each other.

16     237.  Defendants Gregg Bresson, Ray Lopez, Alfonso Valdez, Jeffrey

17 Nacua, James Dibdin, and Does 1 - 10, acting under color of state law, individually

18 and together recklessly conducted the investigation into the death of Consuelo

19 Verdugo. Such reckless investigation includes, but is not limited to a) the failure to

20 fully document and disclose their investigative activities; b) individually and

21 collectively procuring and relying on evidence they knew or should have known

22 was false; c) procuring and relying on unreliable evidence with a reckless disregard

23 for, or deliberate indifference to, the truth and the rights of the accused; d)

24 intimidating witnesses; e) hiding and distorting evidence; f) systematically

25 suppressing exculpatory evidence; and g) falsifying evidence.

26

27

28

238.  As a result of the individual Defendants', and each of their, violations of Plaintiff's constitutional right to disclosure of known material, exculpatory evidence or information, Plaintiff was damaged as alleged herein.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 - *MONELL* VIOLATIONS - INCLUDING POLICY/CUSTOM ARISING FROM DEFENDANT KERN COUNTY'S POLICY AND CUSTOM OF FAILURE TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE, RECKLESS INVESTIGATION, AND  FAILURE TO TRAIN AND SUPERVISE REGARDING THE TRUTHFULNESS, INTEGRITY, PRESERVATION, RELIABILITY AND DISCLOSURE OF EVIDENCE, PARTICULARLY IN THE CONTEXT OF CHILD MOLESTATION INVESTIGATIONS.**

**(Against Defendant Kern County)**

239.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

240.  Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case (the 1980's to at least the mid-1990's), and specifically including but not limited to the years 1991-93 (investigation and trial), Defendant Kern County, by and through the Kern County District Attorney's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervision regarding, inter alia, the following issues:

        a.      ensuring that the law enforcement agencies, their officers, detectives or investigators, including the District Attorney's own investigators (hereafter collectively referred to as "investigating agents"), with which the District Attorney's Office was working provided all exculpatory evidence gathered during an investigation

THIRD AMENDED COMPLAINT FOR DAMAGES

of a case presented to the District Attorney's Office and/or individual prosecutors for prosecution, as numerous cases over the years made clear was its obligation;

b.    ensuring that the investigative agents with which the District Attorney's Office was working provided full investigative material and that that material is actually reviewed by an appropriate Deputy DA for the purpose of ensuring that false or unreliable evidence was not used and that exculpatory evidence was disclosed to the defense;

c.    ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the investigative agents with which the District Attorney's Office was working, and/or by members of its Office;

d.    ensuring that information in related court cases relevant to a case being prosecuted was provided by the investigative agents with which the District Attorney's Office was working to the trial attorney prosecuting that case and/or was disclosed to the defense;

e.    ensuring that exculpatory information in related court cases relevant to a case being prosecuted was provided to the trial attorney prosecuting that case by the investigative agents with which the District Attorney's Office was working and/or was disclosed to the defense;

f.    ensuring that the investigative agents with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of the identification procedures and activities involved, including any conduct that might

THIRD AMENDED COMPLAINT FOR DAMAGES

have tainted the identification, and/or that such information was disclosed to the defense;

g.      ensuring that the investigative agents with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense;

h.      ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense;

i.      ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases;

j.      ensuring that the key investigative reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense;

k.      ensuring that exculpatory evidence learned or discovered after trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel;

l.      Ensuring that the investigative agents handling specialized investigations, particularly the investigative agents handling child molestation and child sex abuse cases, were adequately trained, including proper interview methods and

THIRD AMENDED COMPLAINT FOR DAMAGES

techniques that would avoid leading, suggestive, improper questioning of witnesses in general and children in particular, and training in the need to identify independent corroborating evidence;

m. ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings;

n. establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses;

o. failing to counsel or discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false evidence that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused;

p. establishing procedures so all exculpatory/impeachment evidence discovered by the investigative agents or the District Attorney after the preliminary hearing stage is provided to the defense;

q. establishing procedures so all exculpatory/impeachment evidence discovered by the investigative agents or the District Attorney after a conviction is provided to the defense.

241. Defendant County of Kern, by and through the Kern County District Attorney's Office, had the habit, custom, pattern and practice, during all or parts of

THIRD AMENDED COMPLAINT FOR DAMAGES

the relevant time period (the 1980's to at least the mid-1990's, and specifically 1991-93) of:

a.    In child molestation cases, encouraging and condoning the use of abusive investigative techniques and false evidence, and routinely using and relying on false evidence and suggestive police and social worker interrogations of children and others involved in their investigations they knew or should have known were yielding, or were likely to yield, false evidence;

b.    Condoning and encouraging the use of false, manufactured and unreliable evidence;

c.    failing to disclose exculpatory evidence;

d.    burying exculpatory material in obscure places in a file where it was unlikely that, even if the documents were disclosed to the prosecution or the defense, they would be missed;

e.    not including exculpatory evidence in the key case reports and documents, in the hope and expectation that it would not be noticed or raised by the defense;

f.    entering into benefits agreements with witnesses without disclosing them to the defense;

g.    failing to adequately train and supervise the investigative agents handling specialized investigations, particularly the investigative agents handling child molestation and child sex abuse cases, were adequately trained, including proper interview methods and techniques that would avoid leading, suggestive, improper questioning of witnesses in general and children in particular, and training in the need to identify independent corroborating evidence.

THIRD AMENDED COMPLAINT FOR DAMAGES

242. The customs, policies, practices, failures, actions and inactions of the Kern County District Attorney's Office elaborated above were or should have been known to the policy makers responsible for the Kern County District Attorney's Office and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Kern County District Attorney's Office and its policy makers were on notice of these deficiencies and failures.

243. One or more of the customs, policies, practices, failures, actions and inactions of the Kern County District Attorney's Office elaborated above were so closely related to the deprivation of the Plaintiff's rights as to be a moving force that caused the constitutional violations alleged herein.

244. As a direct and proximate result of Defendant Kern County's acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of district attorney's acts and omissions alleged above, Plaintiff sustained injury and damage to be proved at trial.

245. As a result of Defendants', and each of their, violations of Plaintiff's constitutional rights as set forth herein, Plaintiff was damaged as alleged above.

246. Kern County did not require investigative agents in general, and those assigned to child molestation cases in particular, to attend specialized training in which they would be trained in appropriate investigatory techniques and compliance with constitutional requirements in such investigations.

247. Defendant Kern County, through *inter alia* the Kern County District Attorney's Office and the Kern County Coroner's Office, caused the events which injured Plaintiff as a result of their lack of formal policies or directives describing

and requiring compliance with Plaintiff's constitutional right to the disclosure of material exculpatory information and evidence, and his rights against the creation and presentation of false evidence. Likewise, Kern County, through *inter alia* the foregoing offices, had no mandatory training describing and requiring compliance with Plaintiff's constitutional right to the disclosure of material exculpatory information and evidence, and his rights against the creation and presentation of false evidence. Additionally, Kern County, through *inter alia* the foregoing offices, had no mandatory training addressing witness interviews in felony investigations in general and child molestation investigations in particular, including training addressing interviews techniques known to produce false evidence and requirements for memorializing and disclosing witness interview statements to ensure preservation of potentially material exculpatory information and evidence, and requirements ensuring the integrity, truthfulness and reliability of medical findings related to criminal inquiries and investigations. The need for such training was obvious, as failure to train on these significant components of law enforcement and coroner responsibilities, which implicated and would ensure compliance with the constitutional rights of Plaintiff and others, carried the "highly predictable" consequence of due process violations (either done deliberately or with reckless disregard and deliberate indifference to the truth and the rights of persons accused, or potentially to be accused, of crimes. This failure to train includes any reasonable measures to ensure that the Coroner's Office personnel in general, and Defendant Dibdin in particular, were trained in and complied with constitutional standards. Beyond lack of training, Kern County had no supervisory mechanism to ensure that  investigating agents memorialized and relayed all potentially material exculpatory information and evidence to the District Attorney's Office, or that Deputy District Attorneys disclosed such evidence, or that there were any measures, including counseling or discipline, taken against

THIRD AMENDED COMPLAINT FOR DAMAGES

District Attorney personnel who violated the rights of the accused entitled to the disclosure of exculpatory evidence and evidence that was known to be, or should have been known to be, false. Similarly, the Kern County Coroner's Office had no supervisory mechanism to ensure that Coroner's Office personnel memorialized and relayed all potentially material exculpatory information and evidence to the District Attorney's Office, or that there were any measures, including counseling or discipline, taken against Coroner's Office personnel who violated the rights of the accused entitled to the disclosure of exculpatory evidence and evidence that was known to be, or should have been known to be, false.

248.  Defendant County of Kern, by and through the Kern County District Attorney's Office and Robert Carbone, had the habit, custom, pattern and practice, through the ongoing activities of Defendants Gregg Bresson and Ray Lopez, during the many years of their employment as Investigators for the District Attorney's Office, of:

a.    Improperly influencing witness statements, including autopsy and forensic reports;

b.    Fabricating evidence through the manipulation of witnesses to alter their "recollections" to fit "the prosecution's" theory of criminal liability; and

c.    Failing to disclose potentially material exculpatory or impeachment information and evidence.

249.  During the many years of Defendants Gregg Bresson and Ray Lopez's employment as Investigators for the District Attorney's Office, Defendant County of Kern knew or should have known of Defendants Gregg Bresson and Ray Lopez's customs, and patterns of practice, as described above, and failed to address or prevent it.

THIRD AMENDED COMPLAINT FOR DAMAGES

250. Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case (the 1980's to at least the mid-1990's), and specifically including but not limited to the years 1991-93 (investigation and trial), Defendant Kern County, by and through the Kern County Coroner's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had the habit, custom, pattern and practice, through the ongoing activities of Defendant James Dibdin, during his employment as a pathologist for the Kern County Coroner's Office, of:

a.    falsifying evidence in criminal cases, such as Mr. Benavides' case, in order to assist prosecutors in securing convictions;

b.    Condoning and encouraging the use of false, manufactured, and unreliable reports, including but not limited to autopsy reports, and evidence to further the prosecution's agenda of aggressively asserting child sexual abuse without ensuring the reliability of its evidence;

c.    providing incorrect and misleading causes of death determinations in autopsy reports;

d.    failing to adequately screen, train and supervise its medical personnel, including but not limited to James Dibdin, regarding the truthfulness, integrity, reliability and disclosure of evidence, particularly in the context of child molestation cases;

e.    failing to counsel or discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false evidence that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused;

f.    failing to disclose exculpatory evidence;

85

THIRD AMENDED COMPLAINT FOR DAMAGES

251. Kern County and its officials either knew, or should have known with minimal investigation, of these deficiencies.  In hiring, training, and supervising Dr. Dibdin, Kern County and its officials were deliberately indifferent to, and exhibited reckless disregard for, the truth and the rights of criminal defendants, and to the risk of false evidence being used by Dr. Dibdin to inculpate Mr. Benavides and others.  The Kern County Coroner's Office lacked policies, procedures, and guidelines to ensure that false evidence was not used by its staff and that false evidence was not being presented or relied upon by the District Attorney's Office in prosecuting cases.  Doe Defendant supervisors of Dr. Dibdin were deliberately indifferent to these risks even though they were, or should have been, aware of Dr. Dibdin's custom and practice of falsifying evidence in autopsy reports and other documentary evidence.

252. One or more of the customs, policies, practices, failures, actions and inactions of the Kern County Coroner's Office elaborated above were so closely related to the deprivation of the Plaintiff's rights as to be a moving force that caused the constitutional violations alleged herein.

253. The foregoing actions, omission and inactions of the County of Kern, including through *inter alia* its District Attorney's, Coroner's and Sheriff's Offices, were or should have been known to the Kern County policy makers responsible for ensuring the constitutional rights of citizens are upheld, and occurred with deliberate indifference to either recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

254. In particular, the then District Attorney, Ed Jagels, who was the policy maker for the Kern County District Attorney's Office and for the County of Kern

THIRD AMENDED COMPLAINT FOR DAMAGES

on matters related to the District Attorney's Office, ratified, condoned, encouraged, approved and/or directed the foregoing unconstitutional policies and practices

255. As a direct and proximate result of the County of Kern's acts and omission, condoning, encouraging, ratifying, and deliberately ignoring unconstitutional patterns and practices of Defendants Gregg Bresson, Ray Lopez, and James Dibdin, Plaintiff sustained injury and damages as alleged herein.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - *MONELL* VIOLATIONS - INCLUDING POLICY/CUSTOM ARISING FROM DEFENDANT CITY OF DELANO'S POLICY AND CUSTOM OF FAILURE TO PRESERVE AND DISCLOSE EXCULPATORY EVIDENCE, FABRICATION OF EVIDENCE, RECKLESS INVESTIGATION, AND FAILURE TO TRAIN AND SUPERVISE REGARDING THE TRUTHFULNESS, INTEGRITY, PRESERVATION, RELIABILITY AND DISCLOSURE OF EVIDENCE, PARTICULARLY IN THE CONTEXT OF CHILD MOLESTATION INVESTIGATIONS

### (Against Defendant City of Delano)

256. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

257. Defendant City of Delano, with deliberate indifference and/or conscious or reckless or grossly negligent disregard for the safety, security and constitutional and statutory rights of Plaintiff, and others accused of crimes, including their rights to due process of law under the Fourteenth Amendment to the United States Constitution, created, installed, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied the policies, practices and customs, actions, inactions and omissions regarding preservation of potentially material exculpatory evidence in child molestation investigations, failure to disclose potentially material exculpatory information and evidence, coercive interview techniques, and the creation and presentation of fabricated evidence that was deliberately, recklessly or deliberately indifferently created.

258. Plaintiff is informed and believes and thereon alleges that, during all or portions of the period relevant to this case (the 1980's to at least the mid-1990's), and specifically including but not limited to the years 1991-93 (investigation and trial), Defendant City of Delano, by and through the Delano Police Department, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had a) no established or clear administrative system in place, b) no stated, written or adequate policies, and c) no or inadequate training and supervision regarding, inter alia, the following issues:

a.     a basic and standardized *Brady* policy that outlines and identifies the *Brady* obligations of officers;

b.     ensuring that all exculpatory evidence was prominently communicated in a manner likely to ensure that it would be seen and understood by both the prosecution and defense;

c.     ensuring that its police officers provided their full investigative material in a case submitted to the District Attorney's Office, including but not limited to any investigative materials or notes;

d.     ensuring that all exculpatory evidence was referenced in the key case reports and documents, especially those summarizing the evidence;

e.     ensuring that officers who hear false testimony call that fact to the attention of the prosecutor;

f.     ensuring that officers did not pressure, or use abusive investigative techniques, to induce witnesses to provide the testimony they consider helpful to their case;

g.     ensuring that officers regularly memorialize false witness statements, false reports, and that the Delano Police Department maintains a system where such false statements are made known and available to the

THIRD AMENDED COMPLAINT FOR DAMAGES

detectives and the prosecutors in any case where that person who previously made a false statement is a witness in a subsequent investigation or prosecution;

h.    ensuring that the interactions between a witness and a detective are fully and completely provided in a prominent written report;

i.    ensuring that police personnel, whether through inadvertence or design, did not provide information to potential witnesses that influenced their testimony;

j.    preventing false evidence by omission of material information;

k.    preventing the use of misleading descriptions of events that provide a false impression;

l.    establishing procedures to ensure that any benefits or monies paid to or for the benefit of witnesses were treated as exculpatory evidence and forwarded prominently to the District Attorney's Office and the trial Deputy District Attorney;

m.    ensuring detectives' compliance with constitutional standards regarding false evidence and *Brady*;

n.    ensuring that the investigative agents handling specialized investigations, particularly the investigative agents handling child molestation and child sex abuse cases, were adequately trained and supervised, including proper interview methods and techniques that would avoid leading, suggestive, improper questioning of witnesses in general and children in particular, and training in the need to identify independent corroborating evidence;

o.    establishing procedures to ensure that any evidence pertinent to habeas claims contained in its files are discovered and produced to the District Attorney's Office, the petitioner and the Court;

THIRD AMENDED COMPLAINT FOR DAMAGES

p.    adequately investigating incidents involving the fabrication of evidence, wrongful influence of witnesses, suppression or burying of exculpatory information or other misconduct by its deputies, or complaints of such conduct;

q.    conducting investigations in such a manner as to conceal the misconduct of its officers;

r.    condoning and encouraging the fabrication of evidence, including but not limited to the presentation of materially false investigative reports.

259. Defendant City of Delano, by and through the Delano Police Department, had the habit, custom, pattern and practice, during all or parts of the relevant time period (the 1980's to at least the mid-1990's, and specifically 1991-93) of:

a.    In child molestation cases, encouraging and condoning the use of abusive investigative techniques and false evidence, and routinely using and relying on false evidence and suggestive police and social worker interrogations of children and others involved in their investigations they knew or should have known were yielding, or were likely to yield, false evidence;

b.    condoning and encouraging the use of false, manufactured and unreliable evidence;

c.    failing to disclose exculpatory evidence;

d.    burying exculpatory material in obscure places in a file where it was unlikely that, even if the documents were disclosed to the prosecution or the defense, they would be missed;

THIRD AMENDED COMPLAINT FOR DAMAGES

e.   not including exculpatory evidence in the key case reports and documents, in the hope and expectation that it would not be noticed or raised by the defense;

f.   entering into benefits agreements with witnesses without disclosing them to the defense.

260. The customs, policies, practices, failures, actions and inactions of the Delano Police Department elaborated above were or should have been known to the policy makers responsible for the Delano Police Department and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Delano Police Department and its policy makers were on notice of these deficiencies and failures.

261. As a direct and proximate result of Defendant City of Delano's acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Delano Police Department's acts and omissions alleged above, Plaintiff sustained injury and damage to be proved at trial.

262. As a result of Defendants', and each of their, violations of Plaintiff's constitutional rights as set forth herein, Plaintiff was damaged as alleged above.

263. Defendant City of Delano did not require investigating officers and detectives in general, and those assigned to child molestation cases in particular, to attend specialized training for detectives in which they would be trained in appropriate investigatory techniques and compliance with constitutional requirements in homicide investigations.

264. Defendant City of Delano caused the events which injured Plaintiff as a result of their lack of formal policies or directives describing and requiring

compliance with Plaintiff's constitutional right to the disclosure of material exculpatory information and evidence, and his rights against the creation and presentation of false evidence. Likewise, City of Delano had no mandatory training describing and requiring compliance with Plaintiff's constitutional right to the disclosure of material exculpatory information and evidence, and his rights against the creation and presentation of false evidence. Additionally, City of Delano had no mandatory training addressing witness interviews in investigations in general and child molestation investigations in particular, including training addressing interview techniques known to produce false evidence and requirements for memorializing and disclosing witness interview statements to ensure preservation of potentially material exculpatory information and evidence. The need for such training was obvious, as failure to train on these significant components of law enforcements' responsibilities, which implicated and would ensure compliance with the constitutional rights of Plaintiff and others, carried the "highly predictable" consequence of due process violations. Beyond lack of training, the City of Delano had no supervisory mechanism to ensure that officers memorialized and relayed all potentially material exculpatory information and evidence to the District Attorney's office.

265. One or more of these policies, customs, practices, failures and/or omissions caused the deprivation of Plaintiff's rights by the City of Delano; that is, one or more of them was so closely related to the deprivation of Plaintiff's rights as to be a moving force that played a part in causing the ultimate injury.

266. Defendant City of Delano, by and through the City of Delano Police Department, had the habit, custom, pattern and practice, through the ongoing activities of Defendants Jeff Nacua and Al Valdez, during the many years of their employment, of:

THIRD AMENDED COMPLAINT FOR DAMAGES

a.    Improperly influencing witness statements, including autopsy and forensic or medical reports;

b.    Fabricating evidence through the manipulation of witnesses to alter their "recollections" to fit the prosecution's theory of criminal liability; and

c.    Failing to disclose potentially material exculpatory information and evidence.

267.  Defendant City of Delano, by and through the City of Delano Police Department, acted with reckless indifference, and conscious and reckless disregard for the safety, security and constitutional and statutory rights of criminal suspects and criminal defendants, including Plaintiff, and had no established or clear policy, and did not provide adequate training and supervision, and/or otherwise failed to carry out their responsibilities regarding the following issues:

a.    Failing to properly screen candidates for hire as police officers and failing to properly train and supervise them once hired;

b.    Failing to implement policies or procedures for taking remedial action once aware that officers had or would engage in improper conduct, including manipulating, altering, influencing, or fabricating evidence, or failing to disclose or relay potentially material exculpatory evidence;

c.    Ensuring that there was adequate, independent review and supervision of investigations.

268.  During the many years of Defendants Jeff Nacua and Al Valdez's, employment as a police officers and/or detectives, Defendant City of Delano, by and through the City of Delano Police Department, knew or should have known of Defendants Jeff Nacua and Al Valdez's customs, and patterns of practice, as described above, and failed to address or prevent it.

THIRD AMENDED COMPLAINT FOR DAMAGES

269.  The foregoing actions, omission and inactions of the City of Delano are known or should have been known to the policy makers responsible for ensuring the constitutional rights of citizens are upheld, and occurred with deliberate indifference to either recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

270.  The actions of the City of Delano as set forth herein were a moving force behind the violations of Plaintiff's constitutional rights as alleged and described in this complaint.

271.  As a direct and proximate result of the City of Delano's acts and omission, condoning, encouraging, ratifying, and deliberately ignoring unconstitutional patterns and practices, Plaintiff sustained injury and damages as alleged herein.

### SEVENTH CAUSE OF ACTION
### CLAIM UNDER CALIFORNIA CODE § 815.2 FOR NEGLIGENT HIRING, SUPERVISION, PROMOTION, RETENTION, AND TRAINING
### (Against Defendants Kern County and Does 1-10)

272.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

273.  Kern County and its employees and agents acted recklessly, grossly negligently, and/or negligently in hiring, retaining, and promoting Defendants Gregg Bresson, Ray Lopez, James Dibdin and Robert Carbone, and/or others, including Does 1 through 10, and failing to train, supervise, and discipline them.

274.  Plaintiff's conviction, sentencing, and wrongful imprisonment were the direct result of Kern County's practices and procedures and the result of Kern County's reckless or negligent hiring, retaining, promoting, and failing to train and supervise Defendants Gregg Bresson, Ray Lopez, James Dibdin and Robert

Carbone, and/or others, including Does 1 through 10. These errors and omissions were the actual and proximate cause of Plaintiff's injuries and damages.

275. In engaging in the foregoing negligent hiring, supervision, promotion, retention and training, the Defendants named in this cause of action were not engaged in investigative or prosecutorial conduct.

276. As a direct and proximate result of Defendant Kern County's hiring, retaining, promoting, and failing to train and supervise incompetent and unfit employees, Plaintiff sustained injuries and damage as alleged herein.

## EIGHTH CLAIM FOR RELIEF
### NEGLIGENCE

**(Against Defendants Kern County, Ray Lopez, Gregg Bresson, James Dibdin, Robert Carbone and Does 1 - 10)**

277. Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

278. Defendants had an obligation to exercise reasonable and due care in engaging in the activities described previously.

279. Through its policies, practices, and procedures and failure to supervise and discipline its employees and agents during the investigation, and its failure to oversee the investigation to ensure Plaintiff was protected from foreseeable harm, County of Kern violated its legal duty to Plaintiff.

280. Defendants breached their duty of care to Plaintiff through the conduct of Kern County employees and agents, including Defendants Gregg Bresson, Ray Lopez, James Dibdin, Robert Carbone, and/or others, including Does 1 through 10, which actually and proximately caused Plaintiff's injuries and damages as alleged herein.

281. As a direct and proximate result of Defendant Kern County's negligence as described above, Plaintiff sustained injuries and damage as alleged herein.

THIRD AMENDED COMPLAINT FOR DAMAGES

**NINTH CLAIM FOR RELIEF**
**CLAIM UNDER CALIFORNIA CIVIL CODE § 52.1**

**(Against Defendants County Of Kern, Gregg Bresson, Ray Lopez, James Dibdin, and Does 1-10)**

282.  Plaintiff realleges all the foregoing and any subsequent paragraphs contained in the complaint, as if fully set forth herein.

283. Defendants interfered or attempted to interfere with Mr. Benavides' rights secured by the United States and California constitution and laws, including through the use of threats, intimidation, or coercion.

284.  As a direct and proximate cause of Defendants' recurring failure to come forward with exonerating evidence in their possession, Mr. Benavides suffered exposure to prison conditions and avoidable physical, mental, and pecuniary injuries, for which the individual Defendants are liable.

285. As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiff was injured as set forth above and is entitled to statutory damages under California Civil Code §52, as well as compensatory damages and attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Vicente Benavides Figueroa requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.      General and compensatory damages in an amount according to proof;

2.      Special damages in an amount according to proof;

3.      Exemplary and punitive damages against each Defendant in an amount according to proof that will deter such conduct by Defendants in the future;

4.      Costs of suit, including attorneys' fees, under 42 U.S.C. §1988 and California Civil Code § 52; and,

/ / /

/ / /

THIRD AMENDED COMPLAINT FOR DAMAGES

5. Such other relief as may be warranted or as is just and proper.

DATED: September 14, 2021                Respectfully submitted,

                                         McLANE, BEDNARSKI & LITT, LLP
                                           BARRETT S. LITT

                                         ZAVALA LAW GROUP, P.C.
                                           SALOMON ZAVALA

                                         LAW OFFICE OF DO KIM APLC,
                                           DO KIM

                                         By:  / s /  Barrett S. Litt
                                         Attorneys for Plaintiff
                                         VICENTE BENAVIDES FIGUEROA

## JURY DEMAND

Trial by jury of all issues is demanded.

DATED: September 14, 2021                Respectfully submitted,

                                         McLANE, BEDNARSKI & LITT, LLP
                                           BARRETT S. LITT

                                         ZAVALA LAW GROUP, P.C.
                                           SALOMON ZAVALA

                                         LAW OFFICE OF DO KIM APLC
                                           DO KIM

                                         By:  / s /  Barrett S. Litt
                                         Attorneys for Plaintiff
                                         VICENTE BENAVIDES FIGUEROA

97

THIRD AMENDED COMPLAINT FOR DAMAGES